**[J-32-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| C.G., | : | No. 2 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of the Superior |
| | : | Court at No. 1733 MDA 2016 dated |
| | : | October 11, 2017 Affirming the Order |
| v. | : | of the Centre County Court of |
| | : | Common Pleas, Civil Division, at No. |
| | : | 2015-4710 dated September 22, |
| J. H., | : | 2016. |
| | : | |
| Appellee | : | ARGUED: May 15, 2018 |

**OPINION**

JUSTICE MUNDY                                                        DECIDED: **September 21, 2018**

In Pennsylvania, standing requirements limit who may seek physical or legal custody of a child to the following individuals: (1) a parent; (2) a person who stands in loco parentis to the child; or (3) under certain conditions, a grandparent of the child who does not stand in loco parentis. 23 Pa.C.S. § 5324. We granted allowance of appeal to explore whether a former same-sex, unmarried partner of a biological parent may have standing to pursue custody either as a parent or as a person who stood in loco parentis to the Child, and to what extent post-separation conduct is relevant in an in loco parentis analysis.

I.

Appellant C.G. and Appellee J.H. were a same-sex couple living together in Florida. In October 2006, J.H. gave birth to Child. Child was conceived via intrauterine insemination using an anonymous sperm donor. J.H. is the biological mother of Child.

C.G. shares no genetic connection with Child, and did not adopt Child.[1] Following Child's birth, the couple continued to live together for approximately five years before separating. J.H. and Child moved to a separate residence in Florida in February 2012, and they relocated to Pennsylvania in July 2012.

On December 8, 2015, C.G. filed a custody complaint seeking shared legal and partial physical custody of Child alleging she "acted (and acts) as a mother to the minor child as well, as the minor child was conceived by mutual consent of the parties, with the intent that both parties would co-parent and act as mothers to the minor child." Custody Compl., 12/8/15, at ¶ 3. She averred further that "[i]t is in child's best interests and permanent welfare to have a relationship with both parents." *Id.* at ¶ 7. C.G. continued that she "mutually agree[d] to have a child with [J.H.], and both participated in selecting a sperm donor in order for [J.H.] to conceive their minor child." *Id.* C.G. claimed she served daily as Child's mother from the time of conception and birth until 2011 by, for example, appearing at pre-natal appointments, participating in the birth of Child, and cutting his umbilical cord. *See id.* With respect to her relationship with Child following the dissolution of her relationship with J.H., C.G. claimed that J.H. began withholding Child from C.G. in February 2012,[2] allowing only once a week contact, despite C.G.'s requests for more; J.H. moved Child to Pennsylvania without notifying or consulting C.G.; C.G. has had

---

[1] The parties agree that at the time of Child's birth in 2006, same-sex second-parent adoption was not legal in Florida, and although it became legal in 2010, the parties did not discuss pursuing adoption. *See* N.T., 2/5/16, at 8 (C.G. testified the parties did not talk about adoption following its legalization in Florida); *id.* at 57(J.H testified the issue of adoption "was never raised."); *see also* N.T., 4/12/16, at 310.

[2] C.G. lists the dates of J.H. and Child's move from the shared residence and their move to Pennsylvania as occurring in February and July of 2011, respectively. *See* Custody Compl., 12/8/15, at ¶ 12. However, the record indicates that the relevant time of separation began in 2012. *See, e.g.* N.T., 2/5/16, at 5-6 (C.G. testified that she and J.H. separated in February 2012 and that J.H. moved to Pennsylvania in July 2012, and acknowledged the error in the custody complaint.).

minimal and inconsistent contact with Child, via telephone and one physical contact since J.H. and Child relocated to Pennsylvania; J.H. represented to C.G. she could have more regular contact with Child following the parties' settling financial matters attendant to their separation, but following the parties' resolution of those matters, J.H. did not permit C.G. to see or have contact with Child. *See id.*

On January 6, 2016, J.H. filed preliminary objections to the complaint asserting that C.G. lacked standing to bring an action for any form of custody under 23 Pa.C.S. § 5324 because C.G. is not a parent, does not and did not ever stand in loco parentis to Child, and is not a grandparent. *See* Prelim. Objections, 1/6/16, at ¶¶ 7-11. J.H. disputed that Child was conceived by mutual consent with the intent to co-parent. Rather, she contended that "the decision to have a child was solely that of [J.H.] . . . [C.G.] made it clear to [J.H.] that [C.G.] did not want another child (having two children of her own from a prior relationship) and that [J.H.] would bear responsibility for the child she conceived[.]" *Id.* at ¶ 12. J.H. continued that she bore all costs of Child with the exception of limited situations in which C.G. contributed "minimally," and "since the child's birth [J.H.] has acted as the sole parent for the child. [C.G.'s] involvement was solely that of [J.H.'s] girlfriend from the child's birth until November 2011[.]" *Id.* Additionally, she asserted that pursuant to C.G.'s desire not to be a parent to Child, J.H. "made all decisions regarding the child's education, medical care, growth and development, and attended to all of his daily, educational and medical needs with the exception of limited times during which [C.G.] babysat for [J.H.]" *Id.* J.H. claimed that, in December 2011, C.G. asked J.H. to move out of the shared residence by February 2012 because C.G. wanted to continue a romantic relationship with a woman with whom she was having an affair. *See id.* J.H. agreed that she and Child moved out of the house in February 2012, and moved to Pennsylvania in July of that year. *See id.* She additionally agreed that C.G. "has spoken

with the child only minimally and seen him only one time, which was in March 2014." *Id.* She continued that since the move, C.G. has not provided financial support to Child except for one week of camp and one month of before and after school care, and has occasionally sent nominal gifts. *See id.* She sought dismissal of the complaint based on legal insufficiency and lack of capacity to sue. *See* Pa.R.C.P. 1028(a)(4) and (5).

C.G. filed a response to the preliminary objections on January 25, 2016, in which she claimed standing as a parent under Section 5324(1) or "at the very least" as a person in loco parentis to Child under Section 5324(2). *See* Response to Prelim. Objections, 1/25/16, at ¶¶ 7-11. She generally disputed the factual representations in J.H.'s preliminary objections in support of her own account of the decision to conceive and parent Child. *See id.* at 12.

The trial court held hearings over three days at which a number of witnesses testified and conflicting evidence was presented. Consistent with the assertions in the complaint and responses, the gravamen of the parties' respective presentations was C.G.'s participation in the conception, birth, and raising of Child, the intent of the parties with respect thereto, and the perception others held of the household or family dynamic. For example, C.G. testified she and J.H. "planned to have a child together[;]" that J.H. did not begin the process of trying to become pregnant until C.G. consented; the couple would look for donors together on a donor site; and she considered Child her son from the time he was born. N.T., 4/12/16, at 38-55. Following his birth, C.G. described her relationship with Child as a parent/child relationship. *See id.* at 103. J.H., by contrast, testified the decision to have a child was hers alone, she did not consider C.G. to be a parent to Child, or hold her out to others as such. *See* N.T., 2/5/16, at 28-29 ("[C.G. did not want a child[,]" but "tolerated the idea" of J.H. having one.); *see also* N.T.,4/12/16, at 207-08 ("I wanted to have a child. [C.G.] did not want that, and I let her know I made an appointment with

a fertility doctor, and I was moving forward with that for myself."); *id.* at 222 ("I am [Child's] mom, and [C.G.] is not.").

In all, the trial court heard from 16 witnesses, offering differing testimony on issues bearing on the parties' relationship between and among J.H., Child, C.G., and her daughters (who were, at the relevant time, college age), the intent of the parties prior to and after Child's conception and birth, and parental duties performed for Child. C.G. offered a number of witnesses supporting her position that she acted as a mother to Child and that she and J.H. undertook jointly to conceive and raise child. *See, e.g.,* N.T., 2/5/16, 85-91 (C.G.'s daughter, Christine Comerford, testifying she understood J.H. and C.G. were having a baby together, she was told the Child was her brother, C.G. performed day-to-day activities for Child including picking him up from school, bathing him, and preparing meals); *id.* at 118-130 (C.G.'s daughter, Lauren Comerford, testifying she understood her mother and J.H. were having a baby together, her mother tended to Child and attended his activities as he grew older, and they took vacations together as a family); N.T., 6/20/16, at 123-28 (Terri Michaels, friend and work colleague of C.G., former colleague of J.H., testifying she understood J.H. and C.G. were having a baby together, C.G. would arrange for Terri and her daughter to babysit Child, and she observed C.G. perform parental duties such as preparing Child's meals, playing with him, or correcting him). J.H., by contrast, offered a number of witnesses who testified that J.H. decided unilaterally to have a child and was Child's primary caregiver. *See, e.g.*, N.T., 4/12/16, at 7-11 (Katina Gray, one of Child's babysitters in Florida, testifying J.H. hired her and would discuss Child's needs with her and perceiving C.G.'s involvement with Child akin to "a babysitter"); N.T., 6/20/16, at 17-22 (Dr. Alicia Chambers, J.H.'s friend, testifying to her discussions with J.H. about her commitment to becoming a mother despite the fact that C.G. "didn't want that," "wanted to be free[,] and had her own children" and her

understanding that C.G. did not want to have a child. She explained that C.G. and J.H. had an arrangement "that this was [J.H.'s] child, and therefore, [J.H.] was going to do the work that was involved…"); N.T., 6/20/16, at 48 (J.H.'s brother testifying "it was clear" C.G. did not desire to have a baby, J.H. performed the parental caretaking of Child, and J.H. asked him and his wife to be Child's godparents and "take care of [Child] if anything would happen to [J.H.]").

A number of exhibits, including handwritten notes, e-mails, Child's medical records, and Christmas cards were also admitted into evidence by the parties attempting to evidence or refute C.G.'s status as a parental figure to Child.

On September 22, 2016, the trial court issued an opinion and order sustaining J.H.'s preliminary objection as to C.G.'s standing to pursue custody.[3] The trial court concluded that C.G. was not a parent pursuant to Section 5324(1) because both parties agreed that at the time and place of Child's birth, same-sex marriage and second-parent adoptions were not recognized. Thus, it proceeded to determine whether C.G. stood in loco parentis to Child.

In its analysis, the trial court outlined certain undisputed facts, i.e, that Child was conceived while the parties were in a relationship, Child referred to C.G. as "Mama C[.]," the parties had a commitment ceremony, and C.G. was present for the birth and christening of Child. See Trial Ct. Op. at 5. It then made a number of findings of fact regarding the disputed evidence and testimony of the parties which are supported by the record. First, the trial court looked to whether any documentation existed evidencing the parties' intent that C.G. be viewed as a co-parent to Child. The court noted that C.G. is not listed on Child's birth certificate nor does he bear her name, and notwithstanding the

---

[3] Because the trial court sustained the preliminary objection regarding standing, it did not rule on J.H.'s preliminary objection in the nature of a demurrer.

fact that Florida did not allow second-parent adoption at the time Child was born, neither party suggested adoption following its legalization in 2010 nor executed or memorialized a co-parenting agreement. *See id.* at 6. The trial court considered a note written by J.H. to C.G. that referenced the hope of "having a child together" and one expressing J.H.'s happiness following her baby shower, as well as the fact that Child was a beneficiary on C.G.'s life insurance policy and was carried on her medical and dental insurance plans, prior to separation. *Id.* at 6. However, in weighing the evidence, it concluded "[t]wo letters and one policy" did not overcome J.H.'s testimony that C.G. did not agree to have a child, but merely acquiesced to J.H. having one. *Id.* Moreover, it credited J.H.'s testimony that following the couple's separation, C.G. removed J.H. and Child from her medical and dental policies and would not continue to provide coverage for Child. The trial court found other documentation similarly demonstrated that C.G. was not a parent, and that J.H. did not hold her out to be a parent to others. Specifically, on school and medical forms, C.G. was listed as an emergency contact or as "partner" to J.H., rather than as a parent or mother, and on certain paperwork for activities, she was omitted entirely. *See id.* at 7.

Focusing on the pre-separation period of time, the court evaluated the various and conflicting testimony on C.G.'s discharge of parental duties toward Child. The trial court found it significant that J.H. did not consult C.G. when choosing Child's doctor, preschool, and extra-curricular activities, and J.H. was responsible for the scheduling of Child's appointments, events, and made the childcare arrangements. The court found C.G. occasionally attended activities, appointments, and provided care; however, it further found that such contributions did not amount to the discharge of parental duties, and that J.H. did not encourage C.G. to assume the status of a parent. *See id.* at 8. Turning to the couple's finances, the trial court highlighted that J.H. testified that she solely purchased the items necessary for Child's care, and the couple split household expenses.

The court found C.G. financially contributed to the household overall which created a tangential benefit to Child. *Id.*

With respect to C.G.'s family and testimony offered by her daughters and father reflecting familial titles, such as, in the case of C.G.'s parents, "Grandma A[.]" and "Grandpa J[.]," the court found the interactions were incidental to J.H. and C.G.'s relationships and titles were created for convenience rather than demonstrating an actual familial bond or connection. *See id.* at 8.

The court briefly touched on whether a parent/child bond existed between C.G. and Child. It acknowledged that because the hearings were pursuant to preliminary objections and not a custody determination, evidence was not offered directly on the subject of a bond. It found, nevertheless, that testimony elicited at the hearing demonstrated that Child is well-adjusted and does not request to see C.G. *See id.* at 9.

Finally, the court reviewed evidence regarding the post-separation conduct of C.G. It noted that C.G. did not request to be involved in the educational, medical, or day-to-day decisions concerning Child, C.G. sent nominal care packages, but has only seen Child once since July 2012, in March 2014, when he and J.H. visited Florida. *See id.* The court found that the level of contact for a period of approximately four years is not consistent with a person who has discharged parental duties or assumed parental status. *Id.* at 10. It did not credit C.G.'s assertion that J.H. withheld Child; rather it found J.H. permitted occasional phone contact, provided updates via text messages and email, and accepted gifts for Child. *See id.* It noted J.H.'s account that such interactions were consistent with C.G.'s overall involvement in Child's life and the same as the type of involvement she permitted other friends to have. *Id.* The court concluded that "the parties' post-separation conduct is consistent with the finding that [C.G.] was not a parent to the child." *Id.*

C.G. filed a direct appeal arguing, inter alia, the trial court erred in ruling she was not a parent under Section 5324(1) because she and J.H. jointly conceived and raised Child. The Superior Court concluded the trial court did not err because Pennsylvania "case law has consistently treated same-sex life partners who have not adopted a child as third parties for purposes of custody matters" and C.G. has failed to cite to a statute or case law establishing a non-biological, non-adoptive former partner can be a parent. *C.G. v. J.H.*, 172 A.3d 43, 51-52. (Pa. Super. 2017). C.G alternatively argued the trial court erred in finding that she did not stand in loco parentis to Child. The Superior Court concluded that the trial court's holding was based "on the unique facts of this case" and it's opinion "reflect[ed] a careful, thorough, and proper consideration of the evidence presented by *both* parties, and did not, as C.G. alleges, simply disregard the evidence in her favor." *Id.* at 58-59. Because the decision of the trial court rested on credibility determinations made within the trial court's discretion, the Superior Court affirmed the ruling that C.G. did not stand in loco parentis to Child. *See id.* at 59. Finally, the Superior Court addressed and dismissed C.G.'s argument that the trial court erred by affording too much weight to the post-separation conduct of the parties in its analysis. It observed that the trial court did not find that C.G. was denied standing based on her post-separation conduct; rather, the trial court viewed all of the evidence, including pre-and post-separation conduct, when it evaluated whether C.G. ever stood in loco parentis to Child. *Id.* at 60.

In a concurring opinion, Judge Musmanno questioned whether C.G. should be treated as a third-party for the purpose of custody and suggested "it may be time to re-visit the issue of the appropriate standard and presumptions to be applied in determining standing where a child is born during a same-sex relationship." *Id.* at 60 (Musmanno, J., concurring). He further notes that same-sex marriage was not allowed in Florida at the

time, and suggests that if C.G. were a male, she would have standing as a parent, seemingly assuming that J.H. and C.G. would have formally married had it been legal or had they been in a heterosexual relationship. *See id.* n. 1.

We granted C.G.'s petition for allowance of appeal to consider the following question.

> Whether the Superior Court erred in affirming the decision of the trial court that a former same-sex partner lacked standing both 1) as a parent and 2) as a party who stood in loco parentis to seek custody of the child born during her relationship with the birth mother where the child was conceived via assisted reproduction with an anonymous sperm donor and the parties lived together as a family unit for the first five years of the child's life.

*C.G. v. J.H.*, 179 A.3d 440 (Pa. 2018) (per curiam).

II.

Before addressing the arguments of the parties, we outline some general principles regarding standing in custody matters. The fundamental concept of standing ensures that a party seeking to litigate a matter has a substantial, direct, and immediate interest in the subject-matter of the litigation. *Ken R. on Behalf of C.R. v. Arthur Z.*, 682 A.2d 1267, 1270 (Pa. 1996); *see D.G v. D.B.*, 91 A.3d 706, 708 (Pa. Super. 2014). "In the area of child custody, principles of standing have been applied with particular scrupulousness[.]" *D.G.*, 91 A.3d at 708. This stringent application of standing principles serves to protect both the interest of the court system by ensuring that actions are litigated by appropriate parties and the interest in keeping a family unit free from intrusion "by those that are merely strangers, however well-meaning." *Id.* (citation omitted). Indeed, in evaluating whether a Washington state statute conferring standing to "any person" to seek visitation of children, the United States Supreme Court has recognized the significant interest at stake in the context of persons seeking judicial intervention to gain

visitation or custody of children. "The liberty interest . . . of parents in the care, custody and control of their children-is perhaps the oldest fundamental liberty interest recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). In Pennsylvania, Section 5324 of the Domestic Relations Code limits the classes of persons deemed to have a substantial, direct, and immediate interest in the custody of children by conferring standing only upon "(1) a parent of the child[;] (2) a person who stands in loco parentis to the child[; and] (3) a grandparent of the child who is not in loco parentis to the child[,]" under certain circumstances. 23 Pa.C.S. § 5324. Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action. *K.C. v. L.A.*, 128 A.3d 774, 779 (Pa. 2015). It "is a conceptually distinct legal question which has no bearing on the central issue within the custody action-who is entitled to physical and legal custody" of a child in light of his or her best interests. *Id.* Issues of standing are questions of law; thus, the standard of review is de novo and the scope of review is plenary. *K.W. v. S.L.*, 157 A.3d 498, 504 (Pa. Super. 2017). With that in mind, we turn to the question of C.G.'s standing in the instant case.

III.

A. *Standing as a parent*

C.G. argues that she is a "parent" to Child under 23 Pa.C.S. § 5324(1) because Child was conceived via assistive reproductive means using an anonymous sperm donor; Child was born to C.G.'s partner, J.H., during their relationship; C.G. participated in parenting Child; and C.G., J.H., and Child lived together as a family unit for the first five years of Child's life. C.G.'s Brief at 19, 24. She contends the Superior Court erred when it held the term "parent" is limited to the biological or adopted parents of a child. She urges this Court to hold that legal parentage under Section 5324(1) should include those

who intend to bring a child into the world with the use of assistive reproductive technology and then co-parent the child subsequently born through that process, in addition to the traditional concepts of parentage by biology and adoption. *See id.* at 21. She highlights that medical options to conceive are varied and open to a variety of intended parents.[4] Moreover, same-sex couples, in particular, necessarily feature non-biological parent/child relationships because the couple "must turn to donor gametes to conceive." *Id.* at 25. C.G. reasons that reading this Court's decision in *Ferguson v. McKiernan*, 940 A.2d 1236 (Pa. 2007) with the Superior Court's decisions in *In re Baby S.*, 128 A.3d 296 (Pa. Super. 2015); *J.F. v. D.B.*, 897 A.2d 1261 (Pa. Super. 2006); and *L.S.K. v. H.A.N.*, 813 A.2d 872 (Pa. Super. 2002), illustrates that a genetic connection to a child is not determinative of legal parentage in cases involving assistive reproductive technologies. *See id.* at 27-35.

Consequently, C.G. advocates for an intent-based approach to determining legal parentage when a child is born through the use of assistive reproductive technology. *See id.* at 27-35. C.G. also posits that this intent-based approach is consistent with how other

---

[4] C.G. notes that in 2014, for example, there were 60,000 live births that were the result of in vitro fertilization and the number of children born as a result of donor gametes and gestational carriers has increased. *See* C.G.'s Brief at 25.

jurisdictions and the Uniform Parentage Act (2017) have addressed related issues.[5] C.G.'s Brief at 35-38.[6]

J.H. emphasizes the stringent test applied in determining who has standing in child custody matters is essential to preventing unnecessary intrusion into a family. *See* J.H.'s Brief at 38-42. She continues that the cases C.G. relies on for the proposition that parentage may be determined by intent do not support that reading of the case law because those cases do not relate to parentage by intent, but parentage by mutual assent of the parties. *Id.* at 49. She continues that "it would be wrong to allow [C.G] to be

---

[5] C.G. devotes a portion of her argument to the state of law in Florida at the time of her relationship with and separation from J.H., in particular its restrictions on same-sex marriage and adoption around the time of Child's birth. *See* C.G.'s Brief at 39-47. She argues the trial court's analysis and Superior Court's affirmance did not give due consideration to these legal barriers and instead "the courts below considered the state of law in Florida as a legal conclusion that C.G. is not a parent." *Id.* at 46. She posits to allow these legal impediments to serve as evidence that she lacked intent is unfair to C.G., and others similarly situated "as it allows the discriminatory treatment of LGBT parents-even where the treatment has been held to be unconstitutional-to continue to injure litigants in perpetuity." *Id.*

C.G. seems to suggest she is entitled to a presumption of parentage based on, inter alia, the uncontested fact that she and J.H. participated in a commitment ceremony in Florida prior to Florida's recognition of same-sex marriage. *See, e.g. Brinkley v. King*, 701 A.2d 176, 177 (Pa. 1997) (OAJC) ("One of the strongest presumptions in Pennsylvania law is that a child conceived or born in marriage is a child of the marriage."). However, addressing whether a commitment ceremony in another state should be considered a marriage for purposes of applying presumptions of parentage is beyond the scope of the legal issue presented and the facts of this case. The trial court explained in its Pa.R.A.P. 1925(a) opinion that it wished to clarify that the focus of its analysis was on C.G.'s "actions and/or lack of actions. This finding in no way unconstitutionally restricts persons in a same-sex relationship from being able to reproduce and share legal parentage." Trial Ct. Op., 10/31/16. Moreover, it is not disputed that the parties declined to register with their county as domestic partners or pursue adoption once it became legal.

[6] Academy of Adoption and Assisted Reproduction Attorneys has submitted an amicus curiae brief in support of C.G. Amicus argues the trial court erred by concluding that biology and adoption are the only means to achieve legal parentage in Pennsylvania, the word "parent" is not sufficiently defined, and Pennsylvania should broaden the concept of parentage to determine who a parent is through the eyes of the child.

deemed a legal parent in the absence of [J.H.'s] assent, especially when [C.G.] outwardly voiced objections to the pregnancy and thereafter failed to discharge parental duties." *Id.* J.H. notes that although C.G. accuses the trial court of relying on discriminatory laws in concluding she was not a parent, the court undertook an examination of the evidence to evaluate the intent of the parties in the conception of Child and C.G.'s discharge of parental duties, in its in loco parentis analysis, which is the same standard C.G. advocates for in determining parentage when a child is born via assistive reproductive technology. *Id.* at 50. She emphasizes the factual findings made by the trial court regarding C.G.'s participation in Child's life and asks this Court to disregard C.G.'s factual assertions that were not credited by the trial court.[7] *See id.* at 50-57. She maintains that C.G. is not a parent based on the credible evidence accepted as fact by the trial court. *See id.* at 60.

Section 5324 does not define the term parent. "Absent a definition in the statute, statutes are presumed to employ words in their popular and plain everyday sense, and the popular meaning of such words must prevail." *Centolanza v. Lehigh Valley Dairies, Inc.*, 658 A.2d 336, 340 (Pa. 1995) (citing *Harris-Walsh, Inc. v. Borough of Dickson City*, 216 A.2d 329 (Pa. 1966)). The popular and everyday meaning of the term parent plainly encompasses a biological mother and a biological father and persons who attain custody through adoption, and our case law supports those applications. *See J.F.*, 897 A.2d at 1273 ("Well-settled Pennsylvania law provides that persons other than a child's biological or natural parents are 'third parties' for purposes of custody disputes." (citation omitted))*; Faust v. Messinger*, 497 A.2d 1351, 1353 (Pa. 1985 ) (Recognizing, "[t]he entire body of

---

[7] J.H. further contends that presumptions of parentage are not implicated in this case, despite Judge Musmanno's suggestion in his concurring opinion. *See* J.H.'s Brief at 57-60. Specifically, she acknowledges the unavailability of marriage, but highlights the parties did not formalize their union by registering as domestic partners in their county, an option available to them, and further that Child was born because of the unilateral decision of J.H. *Id.* at 58-59.

law pertaining to adoption harmonizes in order to place an adopted child in the shoes of a natural child in all legal respects[.]" However, the reality of the evolving concept of what comprises a family cannot be overlooked. *See Troxel*, 530 U.S. at 63 ("The composition of families varies greatly from household to household."); *J.A.L. v. E.P.H.*, 682 A.2d 1314, 1320 (Pa. Super. 1996) (Observing, "increased mobility, changes in social mores and increased individual freedom have created a wide spectrum of arrangements, filling the role of the traditional nuclear family[.]"). Thus, C.G. directs our attention to cases that specifically involve the use of alternative means of conceiving and or reproducing through assistive reproductive technologies, and asks this Court to revisit and expand the definition of parent to include persons involved in the process but bearing no biological connection to the resulting child.[8]

*J.F. v. D.B.*, involved the relative rights of parties to a surrogacy agreement vis-à-vis the resulting triplets. In that case, an unmarried couple used the services of a surrogate, an egg donor, and the father's sperm to reproduce. The gestational carrier, who bore no genetic relation to the triplets she delivered, began misinforming Father and

---

[8] C.G. argues *L.S.K* stands for the proposition that Pennsylvania courts have recognized that "a person who intends to create children through assistive reproductive technology ought to be held legally responsible" for the children on the same basis as a parent. C.G.'s Brief at 29. In that case, Mother, L.S.K., and H.A.N. were in a same-sex relationship and Mother eventually bore five children conceived through artificial insemination. *L.S.K.*, 813 A.2d at 874. The couple separated after approximately seven years of living as a family, and H.A.N. filed a complaint for custody. The trial court granted H.A.N. shared legal and partial physical custody, ruling that she stood in loco parentis to the children, *see* 23 Pa.C.A. § 5324(2), not that she was a parent to the children under Section 5324(1). H.A.N. attempted to avoid paying child support for the children, which the trial court denied. The Superior Court affirmed the trial court's determination based on equitable principles: "equity mandates that H.A.N. cannot maintain the status of *in loco parentis* to pursue an action as to the children, alleging she has acquired rights in relation to them, and at the same time deny any obligation for support merely because there was no agreement to do so." *Id.* at 878. However, it did not conclude that H.A.N. was a parent for the purpose of standing requirements. Rather, she was a third party who stood in loco parentis to the children.

his partner, the intended-mother of the children, about the pregnancy and ultimately took them home and assumed them as her own. The trial court voided the surrogacy contract, and concluded the gestational carrier stood in loco parentis and was the children's legal mother. On appeal, the Superior Court held that the gestational carrier was a third party and had not established in loco parentis as she "took custody of the children in flagrant defiance of Father's wishes," it further held the trial court erred in voiding the surrogacy contract and concluding the gestational carrier was the legal mother. *Id.* at 1280. The surrogacy contract at issue identified Father as "Biological Father or Adoptive Father" and his partner as "Biological Mother or Adoptive Mother." *J.F.,* 897 A.2d at 1265. Although Father's partner was not named in the action, the Superior Court concluded the trial court erred in voiding the surrogacy contract. The court declined to rule on the propriety of surrogacy contracts in general, leaving that task for the General Assembly to address. *J.F.,* 897 A.2d at 1280. It is undisputed that C.G. was not a party to a contract in connection with Child's birth, and her reliance on *J.F.* to support the intent-based approach to parentage is misplaced.

This Court addressed a situation involving contracting for release of parental rights in the context of assistive reproductive conception in *Ferguson v. McKiernan*. Mother in that case sought the assistance of a former paramour (Donor) in conceiving a child. Although reluctant initially, Donor agreed to provide his sperm for purposes of in vitro fertilization after Mother agreed to release him from any rights and or obligations attendant to paternity. *See Ferguson*, 940 A.2d at 1239. His identity was intended to remain confidential, and following the birth of the twins, Mother acted in accordance with the agreement for approximately five years at which time she filed a support action against Donor. The trial court specifically found that Mother and Donor had formed a binding oral contract to release Donor from parental obligations in exchange for his participation in

conception; however, it voided the contract reasoning a parent cannot bargain away children's right to support, as allowing such agreement would violate public policy. *See id.* at 1241. This Court disagreed that enforcing such an agreement violated public policy, particularly "in the face of the evolving role played by alternative reproductive technologies in contemporary American society." *Id.* at 1245. The focus of our analysis was the enforceability of what was determined to be a binding oral contract. Our reasoning, in part, follows.

> [W]e cannot agree with the lower courts that the agreement here at issue is contrary to the sort of manifest, widespread public policy that generally animates the court's determination that a contract is unenforceable. The absence of a legislative mandate coupled to the constantly evolving science of reproductive technology and the other considerations highlighted above illustrates the very opposite of unanimity with regard to the legal relationships arising from sperm donation, whether anonymous or otherwise. This undermines any suggestion that the agreement at issue violates a "dominant public policy" or "obvious ethical standards" sufficient to warrant the invalidation of an otherwise binding agreement.

*Id.* at 1248 (internal citations omitted). We found it noteworthy that but for the agreement between Donor and Mother, the children at the center of the issue would not have come into being. *Id.* Thus, we concluded that the agreement obviating Donor of his legal parental rights and obligations was indeed enforceable. *Id.*

More recently, the Superior Court addressed establishing parentage by contract in the context of a surrogacy arrangement where the intended mother was not biologically related to the resulting child in *In re Baby S.* In that case, S.S. and her Husband decided to become parents, and S.S. underwent fertility treatments to achieve that end. Eventually, the couple entered into a service agreement with a company that coordinates gestational carrier arrangements, identifying S.S. and Husband as the intended parents.

The agreement provided that the intended parents could terminate the agreement provided gestational carrier had not undergone the necessary procedure to produce pregnancy; in the event she had, the intended parents could still terminate the agreement, but only after confirmation the gestational carrier was not pregnant. *See In re Baby S.*, 128 A.3d at 298. S.S. and Husband were matched with a gestational carrier in Pennsylvania. They next entered into a service agreement with an egg donation agency, and entered into an ovum donation agreement with an anonymous egg donor providing, in part, "that the Intended Mother shall enter her name as the mother and the Intended Father shall enter his name as the father on the birth certificate of any Child born from such Donated Ova. . . . Donor understands that the Intended Parents shall be conclusively presumed to be the legal parents of any Child conceived pursuant to this Agreement." *Id.* at 299-300 (citations omitted). Following the selection of the egg donor, the couple entered into a gestational contract with gestational carrier providing the intended parents were to assume legal responsibility for any child born pursuant to the agreement and that intended mother wished to be the mother of a child who was biologically related to intended father. *See id.* The gestational carrier became pregnant with an embryo created from Husband's sperm and the anonymous egg donor's egg. S.S. expressed gratitude and largely financed the procedure, and she and Husband attended the twenty-week ultrasound. *Id.* However, prior to the child's birth, S.S. refused to sign the necessary paperwork to have her named on the child's birth certificate because she and Husband were experiencing marital problems. While pregnant, the gestational carrier sought a court order declaring S.S. and Husband to be the legal parents of the child. In the meantime, Baby S. was born, and gestational carrier was named as the mother, and no name was listed for the father. Husband took custody of Baby S. S.S. filed a response and new matter arguing the gestational carrier contract was unenforceable. Following

hearings, the trial court entered an order declaring S.S. and Husband as the legal parents, and resolving other ancillary matters. *Id.* at 301. S.S. appealed to the Superior Court arguing inter alia, the legislature has evidenced its reluctance to sanction surrogacy contracts in the Commonwealth by declining to enact laws recognizing their validity; Pennsylvania provides only two mechanisms to parentage, biology and adoption, and neither situation applies to surrogacy agreements; the Court cannot authorize a new means by which legal parentage is established, and the contract violates public policy by creating a parent/child relationship without an adoption or judicial oversight. *See id.* at 303. Drawing largely from our decision in *Ferguson*, the court concluded that S.S. failed to demonstrate the surrogacy contract was against public policy. *See id.* at 306. The court disagreed with the position of S.S. that the lack of legislative direction regarding surrogacy agreements implies disapproval. Rather, the court reasoned, "the absence of a legislative mandate one way or the other 'undermines any suggestion that the agreement at issue violates a dominant public policy…" *Id.* The court acknowledged, as this Court did in *Ferguson*, that "case law from the past decade reflects a growing acceptance of alternative reproductive arrangements in the Commonwealth." *Id.* Finally, the court expressly disagreed with S.S.'s assertion that a biological relationship or formal adoption are the only ways to attain the status of a legal parent in Pennsylvania:

> Further, the Adoption Act is not the exclusive means by which an individual with no genetic connection to a child can become the legal parent; and nothing in the Adoption Act evinces a "dominant public policy" against the enforcement of gestational contracts. The legislature has taken no action against surrogacy agreements despite the increase in common use along with a [Department of Health] policy to ensure the intended parents acquire the status of legal parents in gestational carrier arrangements. Absent an established public policy to void the gestational carrier contract at issue, the contract remains binding and enforceable against [S.S.].

*Id.* at 306 (citation omitted).

It is beyond cavil that parentage is established either through a formal adoption pursuant to the Adoption Act[9] or when two persons contribute sperm and egg, respectively, either through a sexual encounter or clinical setting, and an embryo is formed that is carried to term and results in a child. However, cognizant of the increased availability of reproductive technologies to assist in the conception and birth of children, the courts are recognizing that arrangements in this latter context may differ and thus should be treated differently than a situation where a child is the result of a sexual encounter. Specifically, the willingness of persons to act as sperm donors, egg donors, and gestational carriers, is at least somewhat dependent on the extinguishment of the donor or carrier's parental claim to any resulting child and the intended parent's release of any obligation to support the child. *See, e.g., In re Baby S.*, 128 A.3d at 298-300 (Egg Donor and Gestational Carrier's respective contracts outlining intended parents were to be deemed legal parents). Given this, and especially in the absence of legislative guidance surrounding this intimate and sensitive undertaking, it seems obvious that contracts regarding the parental status of the biological contributors-whether one is an anonymous contributor or known to the intended parent to the child be honored in order to prohibit restricting a person's reproductive options. *See Ferguson*, 940 A.2d at 1247-48 (opining, "where a would-be donor cannot trust that he is safe from a future support action, he will be considerably less likely to provide his sperm to a friend or acquaintance who asks, significantly limiting a would-be mother's reproductive prerogatives." (footnote omitted)).

Likewise, the Superior Court recognized that after a child is conceived through the use of a surrogate and an egg donor, both of whom contracted away any parental rights

---

[9] 23 Pa.C.S. § 2101 *et seq.*

to the child, the non-biologically related intended parent's contract to assume the role of legal parent is enforceable. *In re Baby S.*, 128 A.3d at 298. Consequently, there appears to be little doubt that the case law of this Commonwealth permits assumption or relinquishment of legal parental status, under the narrow circumstances of using assistive reproductive technology, and forming a binding agreement with respect thereto.[10] The courts of this Commonwealth, when faced with the issue and without legislative guidance, have expressly declined to void such contracts as against public policy.

However, this narrow judicial recognition of legal parentage by contract- where a child is born with the assistance of a donor who relinquishes parental rights and/or a non-biologically related person assumes legal parentage- does not afford C.G. the relief she seeks. There was no dispute that C.G. was not party to a contract or identified as an intended-parent when J.H. undertook to become pregnant through intrauterine insemination. Therefore, she is clearly not a parent under any bases that have been recognized by our jurisprudence.[11]

---

[10] We do not wish to imply that a biological parent may bargain away his or her child's right to support. *See Kesler v. Weniger*, 744 A.2d 794, 796 (Pa. Super. 2000) (rejecting Father's argument that he had a sexual relationship with Mother in order to help her conceive, under the impression she would not hold him responsible for child support).

[11] Notwithstanding the fact that Pennsylvania has not recognized a definition of parent that is based on the mere intentions of two people to be viewed as parents, Justice Dougherty expresses his concern that the failure to now recognize a broader definition results in "a cramped interpretation of 'parent'" that will inevitably inflict continued hardship on non-traditional families, particularly same-sex couples undertaking to start a family. *See* Concurring Opinion, Dougherty, J., *slip op.* at 4. In that regard, Justice Dougherty contends under today's decision "it remains impossible" for both partners in a same-sex couple to have standing as legal parents in the absence of marriage or adoption, "as only one can be biologically related to the child or contract to assume legal parentage." Id. at 1-2. Similarly, Justice Wecht acknowledges that the case law in this area has focused on a contractual relationship among intended parents (or persons who wish to renounce parental claims) but concludes the decision today "does not go far enough" and should draw from earlier decisions an intent-based recognition of parentage. *See* Concurring Opinion, Wecht., J., *slip op.* at 2-5. Justice Wecht further imagines a scenario wherein a

C.G. contends our case law stands for the broad proposition that parentage can be established by intent in situations where a child is born with the aid of assistive reproductive technology. It does not. The jurisprudence in this Commonwealth has declined to void contracts involving surrogacy and/or the donation of sperm or ova recognizing a separate mechanism by which legal parentage may be obtained (or

same-sex partner may be foreclosed from seeking standing as a parent. *See id.* at 5. Respectfully, we disagree, and clarify that nothing in today's decision is intended to absolutely foreclose the possibility of attaining recognition as a legal parent through other means. However, under the facts before this Court, this case does not present an opportunity for such recognition, as the trial court found as fact that the parties did not mutually intend to conceive and raise a child, and the parties did not jointly participate in the process. Indeed, despite the disapproval expressed by the concurring opinions over the development of case law thus far on the evolving definition of the term parent for purposes of standing, Justice Dougherty views it "unnecessary at this juncture to endorse any particular new test for establishing standing as a parent." Concurring Opinion, Dougherty, J., *slip op.* at 4. We agree that "we must await another case with different facts before we may properly consider the invitation to expand the definition of 'parent.'" *See id.* at 4-5.

Justice Dougherty hypothesizes that it is impossible for both partners in a same-sex marriage to attain legal parentage absent marriage or adoption. With respect for this perspective, we must disagree. We do not view today's decision or the case law as developed to compel such a result. For example, in *J.F.*, Biological Father's unmarried partner was the intended mother of the children they sought to have via use of a surrogate. Although the issue in that case was not Partner's standing, but rather the non-biologically related surrogate's standing to the children she bore, the Superior Court expressly declined to void the surrogacy contract. *J.F.*, 897 A.2d at 1280. Likewise, in *In re Baby S.*, the Superior Court concluded that S.S., identified as the Intended Mother, in the surrogacy agreement was to be deemed the legal mother. *In re Baby S.*, 128 A.3d at 298. Although S.S. was married to biological Father, the court grounded its reasoning in the principles espoused in the case law involving surrogacy agreements, not the presumption of parentage married persons enjoy. *Id.* There is nothing to suggest in our case law that two partners in a same-sex couple could not similarly identify themselves each as intended parents, notwithstanding the fact that only one party would be biologically related to the child. However, this issue is not before the Court, and we are not tasked with defining the precise parameters of contracts regarding assistive reproductive technology. Likewise, the doctrine of parentage by estoppel, which Justice Wecht contends heterosexual-sex couples may avail themselves of to seek standing but which same-sex couples may not, is not implicated by the facts before this Court.

relinquished). The facts of C.G.'s case do not place her into this narrow class of cases where legal parent rights and responsibilities have been relinquished or assumed via contract. [12]

C.G. also points to recent decisions in Vermont and Massachusetts to support her intent-based approach. In *Sinnott v. Peck,* 180 A.3d 560 (Vt. 2017), the Vermont Supreme Court addressed whether a person who is not biologically related to a child, has not adopted a child, and is not married to the child's parent may be the legal parent of the child. In that case, Mother had a one-year-old child, whom she had adopted, when she began her relationship with Partner. When Mother's child was two years old, Mother and Partner jointly decided to adopt another child from Guatemala, where Mother's first child was born. The couple sought to adopt using the same agency Mother had used to facilitate her first adoption; however the agency did not permit same-sex parent adoption. Mother presented herself as the adoptive parent, and ultimately, the second child, M.P., was brought home to Vermont in February 2006 and lived as a family unit together with the couple until 2010. *See Sinnott*, 180 A.3d at 561-63. Following the couple's separation, the family division dismissed Partner's petition to establish parentage based on her assertion that she was the intended mother of both children. *Id.* at 563. The

---

[12] We recognize that C.G. was unable to adopt Child at the time of his birth under Florida law. However, her argument is that adoption should not be the sole means by which a non-biologically related person may obtain legal parentage of a child, and that the intent of the parties should be determinative of the issue of parentage. We note C.G. acknowledged in her complaint for custody that Child was born out of wedlock. Custody Compl., 12/8/15, at ¶ 3. Although she now suggests a presumption should apply, she does not focus her argument on why an informal commitment ceremony, without registering her relationship in her municipality as domestic partners, should compel application of the presumption of parentage that married persons enjoy. We decline to speculate on what actions the parties may have taken had Florida law been different at the time of Child's birth; however, as we have noted, the parties declined to seek recognition of their union by registering as domestic partners and likewise declined to pursue adoption when it became available, while the relationship was still intact.

Vermont Supreme Court affirmed the decision with respect to the older child, but concluded the family division erred with respect to the child the parties mutually agreed to adopt. It reasoned that its past case law has "created a legal framework in which parental status is viewed in the absence of marriage, civil union, or biological or adoptive relationship with the child in a narrow class of cases in which the parents intended to bring a child into their family and raise the child together, and did in fact do." *Id.* at 563 (footnote omitted). As we have expressed, our case law has acknowledged a much narrower framework for establishing parentage in the absence of adoption, biology, or a presumption attendant to marriage, and the facts of C.G.'s case do not fit into such a paradigm.[13]

Similarly, C.G.'s reliance on Massachusetts's case law is inapposite to her claim. By statute, Massachusetts, unlike Pennsylvania, provides a presumption that a man is the father of a child born out of wedlock "if he jointly, with the mother received the child into their home and openly held out the child as their child." *Partanen v. Gallagher*, 59 N.E.3d 1133, 1135 (Mass. 2016). In *Partanen*, the undisputed facts were that two women were in a committed relationship and jointly undertook to conceive and have children via in vitro fertilization. The couple welcomed two children. Ultimately, the parties separated and the non-biologically related party sought to be declared the presumptive parent. The Supreme Judicial Court of Massachusetts concluded that the statute may be applied in a gender-neutral manner despite the gendered terms it employed and "may be construed

---

[13] We recognize the view of the concurring Justices favoring a definition of parent that would focus on the intent of the parties as the operative fact in determining who is a parent under Section 5324(1); however the concurrences likewise recognize that this case does not fall into such a framework. *See* Concurring Opinion, Dougherty, J., *slip op.* at 3; Concurring Opinion, Wecht, J., *slip op.* at 7. Accordingly, as expressed *supra*, we agree with Justice Dougherty that it is unnecessary at this time to expand the definition of parent or endorse a new standard under the facts before this Court. *See* Concurring Opinion, Dougherty, J., *slip op.* at 4-5.

to apply to children born to same-sex couples, even though at least one member of the couple may well lack biological ties to the children." *Id.* at 1138 (footnote omitted).

The instant case is not one where a statutory presumption would be bestowed on a similarly-situated male based on cohabitation in the absence of marriage, and as highlighted throughout, the factual findings of the trial court determined that C.G. did not jointly participate in Child's conception and hold him out as her own. Accordingly, this case does not provide this Court with a factual basis on which to further expand the definition of the term parent under Section 5324(1).[14]

III.

B. <em>Standing as in loco parentis</em>

Before outlining the arguments of the parties, this Court has explained in loco parentis as follows:

> *In loco parentis* is a legal status and proof of essential facts is required to support a conclusion that such a relationship exists. . . .
>
> The phrase "*in loco parentis*" refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco*

---

[14] We note other jurisdictions have legislatively addressed the issue of parentage where assistive reproductive technology is employed. *See, e.g.*, 13 Del.C. § 8-201(Delaware statute explaining that a mother-child relationship is established between a woman and a child under a number of circumstances, including, the "woman having consented to assisted reproduction by another woman … which resulted in the birth of a child" and also outlining the scenarios by which one is deemed a de facto parent); DC Code § 16-407 (Washington, D.C. statute establishing parentage in "collaborative reproduction" in different contexts including gestational surrogacy arrangements and defining parent as the intended parent regardless of a genetic connection to the child). As we have observed, however, in this case C.G. was not a party to an agreement to conceive Child and did not intend to be a parent. Thus, even if this Court or the General Assembly expanded the definition of parent, she would not be entitled to the relief she seeks.

> *parentis* embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, can not place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.

*T.B.*, 786 A.2d at 916-17 (citations omitted).

C.G. argues the trial court erred in its in loco parentis analysis in two respects. First, C.G. contends the Superior Court failed to take into account the presence or absence of a parent-like bond between C.G. and Child. C.G.'s Brief at 50-52, 55. She continues that the primary determinant in establishing in loco parentis standing is whether the third-party lived with the child and the natural parent in a family-setting and developed a bond with the child as a result of the natural parent's participation and acquiescence. *Id.* at 52. She highlights cases where in loco parentis has been conferred on a former-partner based on the parties' decision to have a child together and subsequently living together as a family unit and cases where courts declined to confer in loco parentis status where the petitioning party was more akin to a babysitter, or the parties never lived as a family unit, or where the party assumed a parental status in defiance of the parent's wishes. *Id.* at 54-56. C.G. posits that the trial court failed to focus on the existence of a bond and instead created a new test in its analysis by its categorization of the evidence, i.e., it looked to documents, the parties' finances, and who took primary responsibility for Child. *See id.* at 57.

Next, C.G. contends the trial court erroneously held that the post-separation conduct of the parties was determinative of whether she stood in loco parentis. She continues that concluding that the post-separation conduct of a party disaffirms an in loco parentis relationship runs contrary to appellate case law on the matter. *See* C.G.'s Brief

at 61-63. Specifically, she claims the trial court's analysis regarding the post-separation period of time violated three principles of the in loco parentis doctrine, that once attained, the status cannot be lost; post-separation conduct cannot be used to deny a person in loco parentis status; and post-separation conduct may be used to support a finding that a person stood in loco parentis. *See id.*at 63-74. She asks this Court to "hold that the relevant time period in which to examine bonding between the party and the child is the time during which the natural parent fostered or acquiesced to the relationship between the child and the third party."[15]  *Id.* at 62.

J.H. counters that C.G.'s position emphasizing the existence of a bond as the determinant factor is misplaced. Rather, to gain in loco parentis status a person must first demonstrate that he or she assumed parental status and discharged parental duties, a fundamental requirement which C.G. failed to establish. *See* J.H.'s Brief at 61-63. She continues that notwithstanding C.G.'s claim, the trial court examined the nature of C.G.'s relationship with Child. J.H. highlights that C.G.'s current view is the trial court erred by failing to conduct a bonding evaluation, appoint a guardian ad litem, or interview Child, despite not making any of these requests before the trial court. *Id.* at 65.

Responding to C.G.'s argument that the trial court placed too much weight on her post-separation conduct, J.H. notes that the trial court and Superior Court recognized that C.G. did not lose her status based on post-separation conduct; rather, her post-separation conduct was consistent with her pre-separation conduct, i.e., she did not act or hold herself out as a parent to Child. *See id.* at 66-67. Finally, J.H. argues that a rule preventing courts from evaluating post-separation conduct would elevate the rights of

---

[15] The American Academy of Matrimonial Lawyers (AAML), Pennsylvania Chapter has submitted an amicus curiae brief in support of C.G. AAML argues that C.G. has standing as a person in loco parentis to the Child, and the consideration of post-separation conduct is irrelevant and may encourage bad behavior on the part of the parent with custody to withhold the child.

former partners over the rights of natural parents because under 23 Pa.C.S. § 2511(a)(1), parental rights are subject to termination when a parent fails to perform parental duties for a period of at least six months. *See id.* at 68-69. Thus, she maintains post-separation conduct is a relevant factor in looking to whether a party stands in loco parentis.

Section 5324(2) permits a person who stands in loco parentis to a child to petition the court for custody of a child. As noted, gaining in loco parentis status requires the petitioning individual to demonstrate two elements: the assumption of parental status and the discharge of parental duties. *See T.B.*, 786 A.2d at 916-17.

In *T.B.,* on which C.G. relies, a former same-sex partner sought custody rights to a child born during her relationship with the child's Mother. This Court agreed with the conferral of in loco parentis standing on the former partner. Factually, Partner and Mother agreed to have a child together with Mother carrying the child and the Partner choosing the sperm donor. They shared day-to-day parental duties such as taking the child to appointments, the Partner was designated as guardian of child in Mother's will, and she had exclusive responsibility for child when Mother was not present. *See id.* at 914-15. We concluded that the facts demonstrated Partner assumed a parental status and discharged parental duties with the consent of Mother. *Id.* at 920. We also rejected Mother's argument at the time that the legal impossibility of Mother and Partner marrying prohibited the court from conferring on Partner standing based on in loco parentis. "The ability to marry the biological parent and the ability to adopt the subject child have never been and are not now factors in determining whether the third party assumed a parental status and discharged parental duties." *Id.* at 918.

In *J.A.L*, the Superior Court reversed the trial court's denial of in loco parentis standing to a former same-sex partner. In that case, Mother and Partner agreed to raise a child together and together selected the sperm donor. Mother and Partner executed a

nomination of guardian document, which included a statement reflecting the parties' intent to raise the child together, and an authorization for consent to medical treatment, allowing Partner to consent to treatment for the child. Following the parties' separation, the trial court concluded Partner lacked standing. The Superior Court disagreed and noted the following.

> The in loco parentis basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objection.

*Id.* at 1319-20.

The court applied the principles of in loco parentis to the facts and concluded that "[t]he inescapable conclusion to be drawn from this evidence is that in both [Mother's and Partner's] minds, the child was to be a member of their nontraditional family, the child of both of them and not merely the offspring of [Mother] as a single parent. The intention is born out by the documents executed by the parties before the child's birth and by [Mother] giving the child [Partner's] surname as a middle name on the birth certificate." *Id.* at 1321. The Superior Court closely examined the record and concluded that the parties' conduct after the child's birth and pre-separation, established the Mother and Partner's intent to create a parent-like relationship with the Partner. It then turned to post-separation conduct, finding that the "contact was reinforced after the parties' separation, visits which

occurred with a frequency and regularity similar to that of post-separation visits by many noncustodial natural parents and thus must be considered adequate to maintain any bond previously created." *Id.* at 1322. Thus, the Superior Court concluded Partner had standing to challenge custody.

The paramount concern in child custody cases is the best interests of the child. *K.C. v. L.A.*, 128 A.3d at 775. The important screening functions of standing requirements protect the child and the family from unnecessary intrusion by third parties. *See D.G.*, 91 A.3d at 708; *K.W.*, 157 A.3d at 503-04. C.G. seeks to have this Court adopt a rule that the decisive factor in this assessment is the existence of a bond between the third party and the child. Our case law does not support such a loose application of standing principles. The appellate courts of this Commonwealth have consistently described the prerequisites to in loco parentis standing as assumption of parental status and discharge of parental duties.[16] *See Peters v. Costello*, 891 A.2d 705, 710 (Pa. 2005); *K.W.*, 157 A.3d at 505. Here, the trial court found C.G.'s evidence lacking in these important regards based on its credibility determinations, faced with conflicting testimony. Of course, it is a concern to the courts whether a child has developed strong psychological bonds, however, such bonds must necessarily be based on the assumption of parental status and discharge of parental duties in order to achieve this legal status. *See J.A.L.*, 682 A.2d at 1319-20. Indeed, if the determining factor were the child's development of a bond with the person seeking standing, it would be of no moment to the court if the bond was forged contrary to the natural parent's wishes. Acceptance of such a rule would undermine well-established principles of in loco parentis analyses. *See T.B.*, 786 A.2d

---

[16] The in loco parentis test has been applied in the same fashion regardless of whether the person seeking in loco parentis is a former step-parent or a former same-sex partner who had not married the child's biological parent. *See, e.g. Bupp v. Bupp*, 718 A.2d 1278, 1281-82 (Pa. Super. 1998); *J.A.L.*, 682 A.2d at 1318-19.

at 917 (explaining that a third party "can not place himself *in loco parentis* in defiance of the parent's wishes and the parent/child relationship").

Finally, we turn to the question of the court's treatment of C.G.'s post-separation conduct and its bearing on an in loco parentis analysis. As an initial point, we do not disagree with C.G.'s position that the relevant time frame to determine whether a party stands in loco parentis is when the party developed the relationship with the child with the acquiescence or encouragement of the natural parent. Indeed, it is fundamental that a party must have discharged parental duties and assumed parental status in order to gain standing as a third party. The question is of what relevance, if any, is the conduct of the party after there has been some separation between the party and the child. The Superior Court dismissed a mother's argument that her former paramour lost his in loco parentis standing after the parties separated and she remarried in *Liebner v. Simcox*, 834 A.2d 606, 611 (Pa. Super. 2003) (explaining mother had cited no case law to support the proposition that once attained, in loco parentis status could be lost due to change in circumstances). In *J.A.L.*, the Superior Court acknowledged the post-separation conduct of partners to buttress its conclusion that the former-partner of the mother stood in loco parentis. *See J.A.L.*, 682 A.2d at 1322 ("This early contact was reinforced by visits after the parties' separation, visits which occurred with a frequency and regularity to that of post-separation visits by many noncustodial natural parents and thus must be considered adequate to maintain any bond previously created."). We reiterate, the rights and liabilities arising out of in loco parentis are the same as that between child and parent and its status is conferred upon a person who puts him or herself in the situation of a lawful parent. *See T.B.*, 786 A.2d at 916-17. In *J.A.L.*, the court found the post-separation conduct of both parties supported the in loco parentis determination because it was akin to post-separation conduct of many natural parents.

In the instant matter, we agree with C.G. that the post-separation conduct should not be determinative of the issue of standing; however, the conduct by either parent or partner may shed light on the analysis of whether the person seeking standing was ever viewed as a parent-like figure. We recognize that in some situations a natural parent may seek to withhold a child from a person who has assumed parental status (or another natural parent). *See, e.g.*, *Jones v. Jones*, 884 A.2d 915, 919 (Pa. Super. 2005) (awarding primary physical custody to former-partner of natural mother who gained in loco parentis status and disapproving of mother's continued attempts to exclude her former-partner following the couple's separation). However, this potential for misconduct does not render the actions of the person seeking in loco parentis status immune from review following a separation. We note in the instant case, despite characterizing the court's analysis of the post-separation contact determinative of whether or not C.G. stood in loco parentis to Child, it was not. The trial court found, and the record supports, that prior to the couple's separation, C.G. did not assume a parental status or discharge parental duties. The trial court simply concluded that the post-separation conduct of C.G. was consistent with its initial determination, as the Superior Court did in *J.A.L.* In loco parentis analyses are necessarily fact-intensive and case-specific inquiries, and we decline to foreclose a trial court from reviewing all relevant evidence in making this important determination that so greatly will impact the family unit.[17]

---

[17] Indeed, we find persuasive J.H.'s position that it would be incongruous to ignore all post-separation conduct between a third-party and a child for the purpose of assessing whether the party stood in loco parentis, when the Adoption Act provides that a petition seeking involuntary termination of a natural or adoptive parent's rights may be filed if the parent has "evidenced a settled purpose of relinquishing parental claim to a child and has refused or failed to perform parental duties" for a period of at least six months preceding the filing of the petition. 23 Pa.C.S. § 2511. To render all post-separation conduct irrelevant would be to afford a person seeking in loco parentis standing, at any time, a greater advantage to a natural or adoptive parent even in the event the third party had demonstrated his or her relinquishment of parental claims to a child.

IV.

In sum, we conclude that C.G. is not a parent under Section 5324(1) for the purpose of seeking custody of Child. We further conclude that the trial court did not commit error by failing to consider the existence of a bond between C.G. and Child as the decisive factor of whether C.G. stood in loco parentis to Child. Indeed, the trial court undertook to examine all of the evidence of record to determine whether C.G. assumed parental status and discharged parental duties, and we discern no legal error in its analysis. The order of the Superior Court is affirmed.

Chief Justice Saylor and Justices Baer and Todd join the opinion.

Justice Dougherty files a concurring opinion.

Justice Wecht files a concurring opinion in which Justice Donohue joins.