J-A05029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| DANIEL THOMPSON AND MARIA THOMPSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| JOHN D. DAVIS, IV, TASHYA BAYLIS, AND KIMBERLY CARTER | : | No. 1726 EDA 2020 |

APPEAL OF: KIMBERLY CARTER

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  No. CV-2020-002385

| DANIEL THOMPSON AND MARIA THOMPSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| JOHN D. DAVIS, IV, TASHYA BAYLIS, AND KIMBERLY CARTER | : | No. 1727 EDA 2020 |

APPEAL OF: KIMBERLY CARTER

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Delaware County Civil Division at
No(s):  No. CV-2020-002385

BEFORE:   OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED JUNE 17, 2021**

---

[*] Former Justice specially assigned to the Superior Court.

J-A05029-21

Appellant Kimberly Carter,[1] the former paramour of John D. Davis, IV, (Father), appeals from the trial court's orders sustaining the preliminary objections filed by Tashya Baylis (Mother) and dismissing Appellant's counter complaint for custody of Child, based on Appellant's lack of *in loco parentis* standing.[2]  Appellant challenges both the trial court's legal conclusions and the weight of the evidence.  We affirm.[3]

The trial court summarized the underlying facts of this matter as follows:

_____

[1] We use the parties' names in the caption "as they stood upon the record of the trial court at the time the appeal was taken" pursuant to Pa.R.A.P. 904(b).  We note that recent changes to our Rules of Appellate Procedure provide that "[i]n an appeal of a custody action where the trial court has used the full name of the parties in the caption, upon application of a party and for cause shown, an appellate court may exercise its discretion to use the initials of the parties in the caption based upon the sensitive nature of the facts included in the case record and the best interest of the child."  Pa.R.A.P. 904(b)(2); **see also** Pa.R.A.P. 907 (stating that "[w]hen an appeal is filed in a custody action, upon application of a party and for cause shown the appellate court may make a determination that using the parties' initials in the caption is appropriate after considering the sensitive nature of the facts included in the case record and the child's best interest").  These changes to our Rules were approved on October 22, 2020 and became effective January 1, 2021, after the current appeal was filed.  Moreover, no party has applied to this Court for the use of initials in the caption.  We will, however, refer to the minor involved in this custody dispute as "Child" throughout our decision so as to protect his identity.

[2] The trial court also entered a temporary custody order that granted joint legal custody of Child to Mother and Father, maintained Mother's primary physical custody schedule, and awarded Father partial physical custody of Child from Sunday to Wednesday, time that Appellant previously cared for Child under a prior temporary custody order.  However, that order is not before us on appeal.

[3] This Court previously granted Appellant's motion to consolidate the appeals from the trial court's August 13, 2020 orders.  Therefore, we address both appeals together.

- 2 -

On March 10, 2020, Daniel and Maria Thompson, (Paternal Grandparents) filed a complaint for custody seeking custody of [Child]. On April 8, 2020, Paternal Grandparents filed an amended complaint for custody to name [Appellant as a party] and seeking primary physical and joint legal custody of [Child] for Appellant.

On April 16, 2020, Appellant filed an answer to the amended complaint for custody with counter-complaint for custody seeking joint legal and primary physical custody of Child.

On April 16, 2020, Appellant filed an *ex parte* emergency petition for custody seeking temporary sole legal and primary physical custody of [Child] and alleging she had been [C]hild's *de facto* primary physical custodian and thus had standing to sue for custody.

A hearing was held on May 13, 2020 . . . on Appellant's petition for custody, and an order was entered on May 19, 2020 granting Appellant's petition, awarding Mother and Father temporary joint legal custody and Mother primary physical custody, and [awarding] Appellant partial physical custody without prejudice to Mother's position on standing.

[Both Appellant and Father filed motions for reconsideration of the May 19, 2020 temporary custody order, both of which were denied by the trial court on June 3, 2020.]

On June 25, 2020, Mother filed preliminary objections to [Appellant's] counter-complaint for custody, objecting to Appellant's pleadings for lack of standing pursuant to Pa.R.C.P. 5324. On May 28, 2020, Appellant filed an answer . . . alleging she had acted *in loco parentis* to Child and thus had standing to sue for custody.

Trial Ct. Op., 10/5/20, at 1-3 (footnotes omitted).

On July 20, 2020, the trial court conducted a hearing on Mother's preliminary objections and the issue of Appellant's standing to pursue custody, which the trial court summarized as follows:

Mother previously testified that she is a truck driver. N.T., 5/13/2020 at 167 ¶ 1-4. Mother testified that she went on the road July of 2014 and was traveling across the country in different

states. N.T., 5/13/2020 at 182 ¶ 4-5; at 16-17. Mother testified that she currently works for a company locally and works Monday through Friday 8:30 to 4:30. N.T., 5/13/2020 at 167 ¶ 5-9. At the July 20, 2020 hearing on Appellant's standing to pursue custody of the minor child, [Child], the [c]ourt heard testimony about the timeline of where [Child] resided and with whom.

Appellant testified that her [sic] and Father began dating for the second time in the middle of 2013. N.T., 7/20/2020 at 41 ¶ 24-25. Appellant testified that she and Father resided at Appellee[s]/Paternal Grandparents[′] [home] with [Child] through 2014 and into 2015. N.T., 7/20/2020 at 42 ¶ 1-2; at 16-19. Appellant testified that, in 2014, [Child] regularly lived with her and Father at the home of Appellee[s]/Paternal Grandparents while Mother was on the road for work. N.T., 7/20/2020 at 43 ¶ 6-8. Appellant testified that she purchased and moved into a home in August 2015 with Father and [Child]. N.T., 7/20/2020 at 43 ¶ 9-20. Appellant testified that [she,] Father, and [Child] lived there until February 2019 when [she] and Father broke up. N.T., 7/20/2020 at 43 ¶ 21-23. After Appellant and Father's break up, from February 2019 to April 2020, Appellant testified that [Child] lived primarily with her. N.T., 7/20/2020 at 49 ¶ 17-24. Appellant testified that on average Father would have [Child] one night a week, although not consistently. N.T., 7/20/2020 at 50 ¶ 2-10. Appellant testified that on average Mother had [Child] for one overnight a week, although not consistently. N.T., 7/20/2020 at 50 ¶ 11-16.

From February 2019 to early-to-late fall [of] 2019, Mother testified that she received no texts from Appellant regarding where [Child] was living and with whom. N.T., 7/20/20, at 35 ¶ 15-22. Appellant testified that she sent a text to Mother on February 8, 2019 (Exhibit R1) advising her that Father was vacating the residence that they shared.

Mother believed that Father moved out of the home he shared with Appellant in August or September 2019. N.T., 7/20/20, at 31 ¶ 9-13.

Mother testified that from February 2019 to approximately early Fall of 2019, she believed that Father was still living in Appellant's home with [Child]. N.T., 7/20/20, at 32 ¶ 12-19. Father notified Mother verbally [and] told her that he had found a new residence in September or October [of 2019]. N.T., 7/20/20, at 32 ¶ 8-11.

Mother testified that between August, September, [and] October [of 2019], after Father moved out of Appellant's home, she picked up [Child] for her custodial time equally from Father's barbershop or Appellant's home. N.T., 7/20/20, at 33 ¶ 7-25.

During August, September, [and] October [of] 2019, Mother believed that [Child] was living in Appellant's home, while Father was in the process of getting [Child] a bed for his new home. N.T., 7/20/20, at 34 ¶ 3-9.

Between when Father moved out of Appellant's home in early fall of 2019 and March [of] 2020, Mother testified that she discussed with Father him moving out and leaving [Child] with Appellant, and that she disagreed with it. N.T., 7/20/20, at 34 ¶ 10-25. Mother testified [that,] when she left Child while she went out on the road as an overland trucker, she believed she was leaving [Child] with Father, not Appellant. N.T., 7/20/20, at 34 ¶ 10-25.

Appellant testified that Father moved out of her home on February 4, 2019. N.T., 7/20/20, at 49 ¶ 17-20. From February 4, 2019 to April 11, 2020, [Child] primarily resided with Appellant. N.T., 7/20/20, at 49 ¶ 21-24.

Appellant testified that Mother consented to [Child] remaining in her home. N.T., 7/20/20, at 54 ¶ 2-4. Appellant testified that her [sic] and Mother had several conversations and exchanged text messages. N.T., 7/20/20, at 54 ¶ 6-7. Specifically, Appellant testified: "There were many comments made directly to me by her that gave consent for [Child] to be with me." N.T., 7/20/20, at 54 ¶ 7-9. Appellant and Mother had a conversation at Mother's home where Mother told [Appellant] that she would like to get [Child] more, but, according to Appellant, that didn't happen after the conversation. N.T., 7/20/20, at 54 ¶ 15-20.

Mother testified that she appreciates Appellant being there for her child, helping [Child] and Father out, and helping him with homework. N.T., 7/20/20, at 36 ¶ 23-25; at 37 ¶ 1-3. Mother testified that she was appreciative of Appellant standing in her place when she was not present, however Mother testified: "she could have stood in the place as a nanny. A caregiver. Never a mother." N.T., 7/20/20, at 38 ¶ 14-23. Mother testified that she did not like the fact that [Child] remained with Appellant. N.T., 7/20/20, at 39 ¶ 7-9. Mother testified she did not file any custody action, because she did not feel it was necessary since she could see [Child]. N.T., 7/20/20, at 39 ¶ 10-13. Mother filed [a custody

action] once Father denied Mother from getting him. N.T., 7/20/20, at 39 ¶ 14-16.

Appellant testified during the period from February 2019 to April 2020, she oversaw [Child]'s homework, attended his medical and dental appointments, [sic] [and] parent teacher conferences, oversaw his hygiene, purchased his food and clothing, communicated with his teachers, and attended school events, signed him up for extracurricular activities and attended the activities. N.T., 7/20/20, at 50 ¶ 20-25; at 51 ¶ 1-25; at 52 ¶ 1-2.

[Child] attends Ardmore Avenue Elementary School in Lansdowne based on Paternal Grandparents' address, not Appellant's, although Appellant is located within the residency boundaries of that school. N.T., 7/20/20, at 64 ¶ 20-25; at 65 ¶ 1-15. When Father first registered [Child] for school, he and Appellant were residing with Paternal Grandparents. N.T., 7/20/20, at 65 ¶ 1-8.

*Id.* at 3-6 (some formatting altered).

On August 13, 2020, the trial court issued an order sustaining Mother's preliminary objections and an order denying Appellant's counterclaim for custody.[4] On September 10, 2020, Appellant filed timely notices of appeal and Pa.R.A.P. 1925(a)(2)(i) statements.[5] Appellant also filed a motion for reconsideration of both orders, which the trial court denied on October 2, 2020. The trial court issued a Rule 1925(a) opinion addressing Appellant's claims.

_____

[4] The trial court also entered a temporary order amending the physical and legal custody of Child. However, Appellant did not appeal from that order.

[5] On October 16, 2020, Appellant filed a petition to stay the orders pending the outcome of this appeal, which the trial court denied on November 5, 2020. Appellant subsequently filed a petition to stay the orders with this Court on November 16, 2020, which was denied on December 7, 2020.

On appeal, Appellant raises the following issues:

1. Did the trial court commit an error of law in finding that Appellant did not have *in loco parentis* standing to pursue legal and/or physical custody of the minor child pursuant to 23 Pa. C.S. § 5324(2)?

2. Was the trial court's decision sustaining Mother's preliminary objections and dismissing Appellant's counter-complaint for custody against the weight of the evidence?

Appellant's Brief at 6.[6]

## Jurisdiction

Initially, we must determine whether this appeal is properly before us. *See K.W. v. S.L.*, 157 A.3d 498, 501-02 (Pa. Super. 2017) (stating that "since we lack jurisdiction over an unappealable order it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order" (citation omitted and formatting altered)).

In order to be appealable, an order must be: (1) a final order; (2) an interlocutory order appealable by right or permission pursuant to 42 Pa.C.S. § 702(a)-(b), Pa.R.A.P. 311-312; or (3) a collateral order, as set forth in Pa.R.A.P. 313. *In the Interest of J.M.*, 219 A.3d 645, 650-51, 55 (Pa. Super. 2019). "[A] custody order will be considered final and appealable only if it is both: 1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the

_____

[6] Paternal Grandparents filed a brief adopting Appellant's claims on appeal.

custody claims pending between the parties." ***G.B. v. M.M.B.***, 670 A.2d 714, 720 (Pa. Super. 1996) (footnotes omitted).

> However, we have explained that

>> the "collateral order doctrine" exists as an exception to the finality rule and permits immediate appeal as of right from an otherwise interlocutory order where an appellant demonstrates that the order appealed from meets the following elements: (1) it is separable from and collateral to the main cause of action; (2) the right involved is too important to be denied review; and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. ***See*** Pa.R.A.P. 313.

***J.M.***, 219 A.3d at 655 (some citations omitted).

Our Supreme Court has held that an order denying intervention in a child custody case based on a party's lack of standing is appealable as a collateral order. ***See K.C. v. L.A.***, 128 A.3d 774, 780 (Pa. 2015). Therefore, Appellant's appeals are properly before us.

## Standing

Both of Appellant's claims challenge the trial court's conclusion that she did not have *in loco parentis* standing to pursue custody of Child. Appellant's Brief at 38. First, Appellant asserts that "the record overwhelmingly reflects that [she] assumed parental status and discharged parental duties from the time that the child, who is now eleven years old, was only four years old." ***Id.*** at 40. Relying on this Court's decision in ***M.J.S. v. B.B***., 172 A.3d 651, 657 (Pa. Super. 2017), Appellant contends that she was "not required to prove that one of child's parents relinquished a parental role to her – only that she

assumed a parent-like status and discharged parental duties." *Id.* at 48. However, she also asserts that she "had Father's explicit consent to the assumption of parental duties and discharge of parental duties from the time that he moved into [Appellant's] home with the child to live as a family unit, if not before." *Id.* at 55. Further, she claims that she "likewise had Mother's consent through Mother's long-standing failure to act in a manner inconsistent with consent." *Id.*

Appellant also argues that the trial court's conclusions were against the weight of the evidence. *Id.* at 55. Specifically, Appellant claims that the trial court mischaracterized her role in Child's life as that of a "childcare provider," which was not supported by the record. *Id.* at 59. Further, she asserts that the trial court erred in failing to consider the effect of her relationship with Child on Child's best interest. *Id.* at 65.

> In custody cases under the Act, our standard of review is as follows:
>
> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

"Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action." *C.G. v. J.H.*, 193 A.3d 891, 898 (Pa. 2018) (citing *K.C.*, 128 A.3d at 779). Standing "is a conceptually distinct legal question which has no bearing on the central issue within the custody action-who is entitled to physical and legal custody of a child in light of his or her best interests." *Id.* (citation omitted and formatting altered). Issues of standing are questions of law; thus, the standard of review is *de novo* and the scope of review is plenary. *K.W.*, 157 A.3d at 504.

Section 5324 of the Domestic Relations Code provides that the following parties have standing to pursue custody of a child: "(1) a parent of the child[;] (2) a person who stands *in loco parentis* to the child[; and] (3) a grandparent of the child who is not *in loco parentis* to the child[,]" under certain circumstances. 23 Pa.C.S. § 5324.

> This Court has explained:
>
> The term *in loco parentis* literally means 'in the place of a parent. A person stands *in loco parentis* with respect to a child when he or she "assum[es] the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties." Critical to our discussion here, "*in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of [,] the wishes of a parent."

*K.W.*, 157 A.3d at 504-05 (citations omitted and formatting altered); *see also T.B. v. L.R.M.*, 786 A.2d 913, 917 (Pa. 2001) (emphasizing that a third party cannot achieve *in loco parentis* status in defiance of the parents'

wishes); **M.J.S.**, 172 A.3d at 657 (concluding that the grandmother had *in loco parentis* status where she assumed parental status, discharged parental duties, and the child's father did not oppose her assumption of parental duties at any point).

Here, in concluding that Appellant lacked *in loco parentis* standing, the trial court explained:

> Appellant should not be granted *in loco parentis* standing. Appellant's claim for *in loco parentis* standing is based on her performance of childcare duties both during and after the relationship with Father. The evidence does not support her claim of standing for either time period.
>
> All parties agree that Child lived with Father and Appellant from August 2015 until his father left the residence in 2019. During that period of time, Appellant performed various caregiving duties at Father's behest, including: supervising homework, attending medical [appointments], attending parent teacher conferences and school events, and paying for household groceries, clothes and extra-curricular activities for which she was reimbursed by Father. N.T., 7/20/20, at 44 ¶ 5-25; 45 ¶ 1-25; 94 ¶ 23-25; 100 ¶ 1. Appellant testified that she and Paternal Grandmother are both listed as emergency contacts for school, extra-curricular activities, and medical providers but that both parents are on the forms as well. N.T., 7/20/20, at 81 ¶ 18-25; at 82 ¶ 1-5. She further testified that she never executed any legal documents for Child, never made any independent medical decisions for Child, and only conveyed information learned at medical appointments to Father, who made any necessary legal decisions. N.T., 7/20/20, at 83 ¶ 17-25; at 84 ¶ 1-20. Appellant also testified that in the beginning of her relationship with Father, that he would communicate with [Mother;] however, beginning in approximately 2018, Father asked her to directly communicate with Mother, which she did. N.T., 7/20/20, at 63 ¶ 16-25. Although Appellant's home is in Child's school district, Child has been registered from the Paternal Grandparents' home since he began living in Appellant's home. N.T., 7/20/20, at 23 ¶ 2-14. Neither parent ever changed Child's home address for school purposes, and neither ever gave Appellant the authority to do so.

. . . [N]othing in the instant record indicates that the parents ever intended for [C]hild to reside permanently with Appellant and that the living arrangement was temporary based on Father living in the same residence.

Appellant and Father lived together in a romantic relationship for approximately four years[;] therefore, it is natural to expect that as part of their relationship, that she would perform some caregiving for the child who lived in her home. The record supports the finding that Appellant, as the child's father's paramour, helped [Father] with Child when requested. Although Father never sought Mother's explicit permission or consent for Appellant to provide those duties, she was aware of them and never voiced an objection. However, assistance at one parent's behest and with the other parent's knowledge does not automatically confer *in loco parentis* standing. Between 2015 and 2019, neither of the parents relinquished any parental duties or legal rights to Appellant[;] they maintained complete supervision and control over the child's safety, health and wellbeing, and any favors that Appellant performed for Father were solely a result of their romantic relationship. Mother appreciated that Appellant assisted Father, but she never told or asked her to engage in any caregiving duties, and she credibly testified that when she went on the road, she left her son with his father, not with Appellant. N.T., 7/20/20, at 34 ¶ 15-20. Appellant also never made any independent legal decisions about the child's education or medical care and was never given authority to do so by either parent. The [c]ourt finds that substantial credible evidence was presented which support the finding that Appellant acted only at Father's request and not as an independent permanent parental authority. N.T., 7/20/20, at 63 ¶ 16-25; at 64 ¶ 1-3.

Therefore, the [c]ourt finds that Appellant does not have *in loco parentis* standing based on her caregiving duties from 2015 through 2019.

The parties had vastly different testimony as to the length of time that Appellant cared for Child after Father vacated their joint residence. Appellant testified that she sent a text to Mother on February 8, 2019 (Exhibit R1) advising her that Father was vacating the residence that they shared. Appellant testified that she had multiple conversations with Mother after February 8, 2019, during which Mother gave her consent for child to remain living primarily with her, *see id.* at 54 ¶ 2-20, however, Mother testified that, when she learned from Father that he had moved

out, he informed her that [Child] would also be moving out to live with him. *Id.* at 16 ¶ 11-20. Father testified that he vacated Appellant's residence during the week of February 4, 2019, that he told Mother about his move in February 2019, and that he sent her texts containing photos of him building a bunkbed for the child. *Id.* at 90 ¶ 21-25; at 91 ¶ 1-14. Mother testified that she eventually learned that the child was still living with Appellant and confronted Father multiple times about the child's living arrangement, to which his response was that he needed to buy the child a bed for his new home. *Id.* at 16 ¶ 21-25; at 17 ¶ 1-12. Mother further testified that she believed that Father was still living with Appellant until the fall of 2019. *Id.* at 31 ¶ 9-25; at 32 ¶ 1-19.

Mother was credible in her general description of the timeline and information that was provided to her by both Father and Appellant. The [c]ourt finds that Father failed to provide Mother with a complete plan about where the child would live once the relationship was over. The [c]ourt also finds that the February 8, 2019 text sent by Appellant to Mother does not state that Father was vacating her home and only informs her of the potential breakup. Although the [c]ourt finds that Father neglected to keep Mother fully apprised of the child's living arrangements, the [c]ourt does not find it credible that Mother initially learned that Father vacated the home in the Fall of 2019. *Id.* at 31 ¶ 9-25; at 32 ¶ 1-19. At an earlier hearing, Mother testified that the only reason why she did not remove the child from Appellant's home after Father left was so that he could complete the school year at his longtime school, *see* N.T., 5/13/20 at 170 ¶ 19-25; 171 ¶ 1-8, which naturally means that she knew that Father had left before the end of the 2019-2020 school year. However, that decision by Mother also does not result in *in loco parentis* status for Appellant.

The record shows that Father, in essence, strung Mother along with promises that Child would be moving in with him once he got Child a bed. The [c]ourt does not find Father credible in his claims that he was building Child a bed and that, upon completion of that act, Child would move in with him. According to Father, he began building a bed in February 2019[;] however, as of April 2020, the bed was not finished, and [Child] was still living at Appellant's home. Even if the [c]ourt were to find it credible that Father was building a bed for thirteen (13) months, the fact that he told Mother that his plan was for Child to vacate Appellant's home and live with him is evidence that he intended to maintain the parental role and not to relinquish it to Appellant.

- 13 -

Father testified at the earlier hearing that the only reason why he wants his son to primarily live with Appellant is because she was a "straight A student" who was better equipped to help Child with his schoolwork, even though [Father] can contact the teachers directly. N.T., 5/13/20 at 145 ¶ 6-25; at 146 ¶ 1-25; at 147 ¶ 1-11. Father additionally testified that there is no abuse or neglect in his home, that he also helps Child with his schoolwork, and that he had previously hired a tutor for Child. N.T., 5/13/20 at 141 ¶ 1-25.

Therefore, the [c]ourt finds that Appellant does not have *in loco parentis* standing based on her caregiving duties from February 2019 through April 2020.

It is obvious to the [c]ourt that Father is impressed by Appellant's academic credentials and that, although they are no longer in a romantic relationship, he feels that she can provide [Child] with appropriate educational guidance. Unfortunately, [Father] does not have such a high opinion of Mother[;] however, the instant issue is not Mother's parental capacity but whether or not Appellant stands *in loco parentis* to the child. In February 2019, Mother was no longer employed as a long-distance truck driver and maintained her home and employment in the Philadelphia area - she could have easily had the child in her home on a primary basis, yet neither Appellant nor Father included her in the planning, and both failed to keep her completely apprised of the living situation. Mother is further credible in describing her repeated attempts to confirm Child's living arrangements with Father following his move, and she was consistently assured by [Father] that the child would be moving in with him expeditiously. Father's failure to honestly and succinctly communicate with Mother was not because he had ever relinquished his parental role to Appellant, but only because he held Mother and her parenting skills in contempt.

*In loco parentis* status cannot be established absent the approval of the child's biological parents. Mother testified that, although she knew that child still primarily resided with Appellant after Father vacated the residence, she strongly disagreed with that arrangement. She testified that they argued about that decision and that she "felt like he just walked out, and you know, left him with her." N.T., 7/20/20, at 34 ¶ 10-25. The [c]ourt agrees with Mother's opinion and finds that Father's somewhat relaxed view of his parental role is the only precipitating factor for Appellant's assistance and that, although he left the child at [Appellant's]

home, he did not intend for [Child] to remain there. Although the admitted nature of their joint caregiving for Child makes sense under the former circumstances, there is no evidence that either biological parent required [Appellant] to do so.

Here, Appellant, a third party, cannot place herself *in loco parentis* status in defiance of the parents' wishes. *In loco parentis* status cannot be achieved in disregard of the wishes of a parent. Thus, a third party may not intervene and assume [*in loco parentis*] status with respect to a child where the natural parent opposes such intervention.

Mother testified in no uncertain terms that she only viewed Appellant as a caregiver or a nanny, **see id.** at 36 ¶ 23-25; 37 ¶ 1-5; 38 ¶ 14-23; 39 ¶ 7-9, and Father clearly only regards her as a free tutor with no intent for Appellant to assume all of the rights and responsibilities of parenthood. Appellant's *in loco parentis* status cannot be established absent the approval of the child's biological parents. As [in **K.W.**], the biological parents' express, rather than implied consent is required for Appellant to have *in loco parentis* standing. The biological parents in this matter never gave express consent to Appellant to have *in loco parentis* standing with respect to the child and, most importantly, never admitted that they relinquished any parental role or status to Appellant, and never intended for [Appellant, who is] Father's former paramour, to take on the permanent role of a parent. Although Appellant may indeed be a well-meaning acquaintance, she should not be permitted to usurp Mother's parental role.

In conclusion, there was insufficient evidence to establish *in loco parentis* standing [for Appellant,] Father's former paramour.

Trial Ct. Op., 10/6/20, at 6-18.

Based on our review of the record, we agree with the trial court's conclusions. **See K.W.**, 157 A.3d at 504. Although Mother knew the extent of Appellant's involvement in Child's care, Mother did not view Appellant as a parental figure. **See** Trial Ct. Op. at 18. Therefore, absent Mother's express consent, Appellant cannot establish *in loco parentis* standing to pursue custody of Child on that basis. **See K.W.**, 157 A.3d at 504-05; **see also T.B.**,

786 A.2d at 917. **Cf. M.J.S.**, 172 A.3d at 657 (finding that the grandmother had *in loco parentis* status where she assumed parental status, discharged parental duties, and the child's father did not oppose her assumption of parental duties at any point).

We also note that, contrary to Appellant's claim, standing does not require an evaluation of the Child's best interests. **See C.G.**, 193 A.3d at 898. Further, the trial court's conclusions are based on competent evidence supported by the record. **See C.R.F.**, 45 A.3d at 443. Therefore, to the extent Appellant challenges the weight of the evidence and the credibility of the witnesses, we will not disturb those determinations on appeal. **See id.**

For these reasons, we conclude that the trial court properly sustained Mother's preliminary objections and dismissed Appellant's counter complaint based on Appellant's lack of standing. **See K.W.**, 157 A.3d at 504-05. Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/17/2021

- 16 -