J-A23016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MARK FRANCIS LEGG | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUZERNE COUNTY CHILDREN AND | : | No. 106 MDA 2021 |
| YOUTH SERVICES | : | |
| | : | |
| | : | |

Appeal from the Order Entered December 10, 2020
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 2020-02268

BEFORE: PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.: **FILED: JANUARY 28, 2022**

The issue in this appeal is whether Mark Francis Legg has standing to seek custody of S.K., who is the biological daughter of a woman to whom Legg was formerly married. S.K. is currently in the custody of Luzerne County Children and Youth Services ("CYS"). Legg acknowledges that he is not biologically related to S.K. and did not formally adopt her, but claims for the first time in this appeal that he has standing to seek custody of her as her parent. Alternatively, Legg argues that he stands *in loco parentis* to S.K. and therefore has standing in that capacity to seek custody of her. We disagree with Legg on both counts, and, after careful review, we find that the trial court

---

[*] Former Justice specially assigned to the Superior Court.

did not err in concluding that Legg does not have standing to seek custody of S.K. We therefore affirm.

S.K. was born to Connie Legg ("Connie") and D'Ronald Kinney in 2009. Connie met Legg in 2013. The two had a child together, K.L., on April 15, 2014, and then married on July 25, 2015. In July 2016, S.K. and her brother, J.K.,[1] came to live with Legg, Connie and K.L. Legg and Connie separated in January 2018, and Connie, S.K. and J.K. went to live with Connie's mother and step-father.

Connie sought the assistance of CYS in April 2018. S.K. was declared dependent[2] and placed in foster care. S.K. has lived with her current foster mother since May 2, 2018. On September 14, 2019, both Connie's and D'Ronald Kinney's parental rights to S.K. were terminated.

S.K.'s foster mother filed a petition to adopt S.K. and the court scheduled an adoption hearing for March 25, 2020. Meanwhile, on February 21, 2020, Legg, now divorced from Connie, filed a custody complaint seeking custody of S.K. In his petition, Legg alleged that he had standing to seek custody because, as the former step-father of S.K., he stood *in loco parentis* to her. CYS filed a petition to intervene as well as preliminary objections to

---

[1] J.K. is not involved in this appeal, as Legg did not seek custody of J.K. **See** N.T., 7/23/20, at 21.

[2] Legg was not a party at the dependency proceedings, nor did he attempt to intervene in those proceedings. **See** N.T., 7/23/20, at 17.

the custody petition, both of which challenged Legg's assertion that he had standing in the custody matter as *in loco parentis* to S.K. By agreement of the parties, the court entered an order granting CYS's petition to intervene and dismissing S.K.'s natural parents and the foster mother as parties to the action.

Legg filed a "petition to set *in loco parentis* standing hearing on [Legg's] complaint for custody and to stay [the] adoption hearing set for March 25, 2020." The trial court stayed the adoption hearing and proceeded to hold hearings on July 23, 2020, August 24, 2020 and September 17, 2020, to determine whether Legg stood i*n loco parentis* to S.K. and therefore had standing to seek custody.

Legg testified at the hearing on August 24, 2020, and again at the hearing on September 17, 2020. He stated that S.K. lived with him, Connie, J.K. and K.L. from July 2016 to January 2018, or for what amounted to approximately 19 months. Legg testified that during that time, he raised S.K. as if she was his own daughter and performed a wide range of parental duties for her, including buying her clothes and food, registering her for school, taking her to doctor appointments and doing various activities with her. ***See*** N.T., 8/24/20, at 16-18; N.T., 9/17/20, at 9. Legg's mother also testified, and her testimony echoed Legg's testimony: she recounted that Legg fed S.K., bought her clothes, and did a wide variety of activities with S.K. while she lived with Legg. ***See*** N.T., 9/17/20, at 47-48.

- 3 -

Legg testified that after he and Connie separated in January 2018, and Connie left with S.K., he obtained a Protection From Abuse Order against Connie. He maintained that this prevented him from seeing S.K. *See* N.T., 8/24/20, at 35-36; N.T., 9/17/20, at 11. Legg testified that Connie refused to allow Legg to see S.K., other than one time in February 2018. *See* N.T., 8/24/20, at 35; N.T., 9/17/20, at 10-11. He testified that in February 2018, he filed for custody of K.L. in Lackawanna County, and he claimed that he also filed for custody of S.K. at the same time. *See* N.T., 9/17/20, at 29. According to Legg, he was denied any custody rights to S.K. by the Lackawanna County trial court "because the current custody order only had Connie's name on it." N.T., 9/17/20, at 30.

Legg recounted that on May 1, 2018, he was contacted by a CYS intake supervisor, Samantha Keska, who asked Legg if he would like to be considered as a placement resource for S.K. Legg claimed that he told Keska he wanted to be considered, and that Keska replied that she would follow up with a home evaluation. *See* N.T., 8/24/20, at 37-38. Legg maintained that he never heard back from Keska, and although he called her "at least twenty" times, she never returned his calls. *See* N.T., 8/24/20, at 38-39; N.T., 9/17/20, at 15-16. He specifically testified that he never told Keska that he could not be a placement resource for S.K. *See* N.T., 9/17/20, at 35, 77-78, 80-81.

Legg testified that the next time he heard from CYS was on April 15, 2019, when he received a letter from Megan Donovan, a CYS caseworker,

asking Legg if he wanted to be a lifelong connection to S.K. He claimed he called Donovan multiple times but never heard back from her. *See* N.T., 9/17/20, at 19-20. Legg testified that he received the same letter from Donovan in July 2019, and he once again tried to contact Donovan, but she did not call him back until August 2019. *See* N.T., 9/17/20, at 21. At that time, Legg said, Donovan asked him if he wanted to visit S.K. He and K.L. then had supervised visits with S.K. on August 23, 2019, September 20, 2019 and October 11, 2019.

Both Keska and Donovan also testified at the hearings, but their accounts of their interactions with Legg conflicted significantly with the ones given by Legg. Keska agreed that she contacted Legg in May 2018 and he expressed interest in becoming a placement resource for S.K. *See* N.T., 9/17/20, at 60-61. Keska recalled that she then went to Legg's house on May 9, 2018, and told Legg that he had passed his clearances and that she was hoping to soon move S.K. in with Legg. *See id.* at 61. However, Keska testified that at that time, Legg told her he was no longer able to be a placement resource for S.K. *See id.* at 61, 62.

As for Donovan's testimony, Donovan agreed that she sent a letter to Legg on April 8, 2019. *See id.* at 69. Donovan testified, however, that Legg never responded to that letter, prompting her to re-send the same letter in July 2019. *See id.* at 70. Donovan testified that she reached out to Legg at the request of S.K.'s foster mother, as S.K. wanted to see her half-sister, K.L.

*See* N.T., 7/23/20, at 18. Donovan explained that it was her intent to set up visits between the siblings, *i.e.* S.K., K.L. and J.K., and not visits between Legg and S.K. *See id*. at 31; N.T., 9/17/20 at 70.

After Legg attended the visits, Donovan testified that CYS requested that the visits be only between the half-siblings/siblings - and not Legg - because the visits involving Legg were negatively affecting S.K. by making her anxious and "emotionally draining her." *See* N.T., 7/23/20, at 19-20, 28; N.T., 9/17/20, at 71. Donavan indicated that Legg was putting pressure on S.K. to decide who she wanted to live with, and although S.K. wanted to continue to see her half-sister, she also wanted to continue to live with her foster mother. *See* N.T., 7/23/20, at 30, 32. Donavan testified that the court entered an order excluding Legg from the sibling visits on November 14, 2019. *See* N.T., 9/17/20, at 71. Donovan further testified that Legg has not discharged any parental duties since CYS assumed custody of S.K. in April 2018. *See* N.T., 7/23/20, at 32, 33.

Following the hearings, the court took the matter under advisement given that it was, in the court's words, "a very monumental decision [it] must make." N.T., 9/17/20, at 86. The court entered an order on December 9, 2020, finding that Legg did not stand i*n loco parentis* to S.K., and therefore did not have standing to pursue custody of her.

Legg filed a timely notice of appeal, along with a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Legg essentially argued in his

statement that the court had erred by finding that he did not stand *in loco parentis* to S.K. and therefore lacked standing to seek custody. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion in support of its conclusion that Legg did not have standing to seek custody as *in loco parentis* to S.K.

Issues of standing are questions of law, and our standard of review is therefore *de novo* and the scope of review is plenary. *See **C.G. v. J.H.***, 193 A.3d 891, 898 (Pa. 2018). Generally, standing ensures that only a party who has a substantial, direct and immediate interest in a matter is able to litigate the matter. *See **id.*** "In the area of child custody, principles of standing have been applied with particular scrupulousness[.]" ***Id***. (citation omitted).

Determining standing in a custody dispute is also a threshold issue that must be resolved before a court may reach the merits of the underlying custody action. *See **id***. Section 5324 of the Domestic Relations Code controls standing in custody matters and confers standing only upon: (1) a parent of the child; (2) a person who stands *in loco parentis* to the child; or (3) a grandparent of the child under certain conditions. *See **id.*** at 898.; 23 Pa.C.S.A. § 5324(1)-(3).

Legg first argues that the trial court erred in finding that he lacked standing to seek custody of S.K. as a parent pursuant to Section 5324(1). However, the framing of Legg's issue is misleading. The trial court did not address this issue because, as the above procedural history makes clear, Legg did not raise it before the lower court. Instead, Legg's custody complaint,

petition for a hearing on standing, the arguments at the hearings themselves, and Pa.R.A.P. 1925(b) statement all limit Legg's argument regarding standing to one that he stood in *loco parentis* to S.K. At no point prior to appeal did Legg claim he had standing as S.K.'s parent. This issue is therefore waived. *See Commonwealth v. Bullock*, 948 A.2d 818, 822 (Pa. Super. 2008) (stating that issues that are not raised in the lower court are waived on appeal).

Even if we were to overlook waiver and proceed to the merits of the claim, we would find it lacks merit. Legg essentially claims that he should have standing as S.K.'s parent because he was her former step-father, S.K. lived with him in a family unit for 20 months, and he is the father of S.K.'s half-sibling, K.L. He acknowledges that Section 5342 does not define the term parent. He urges this Court to find that a parent for purposes of Section 5342 is not limited to the biological or adopted parents of a child but rather, includes those who co-parent a child in the manner in which Legg did and who are the biological parent to that child's half-sibling. In support, Legg points to this Court's statement in *C.G.* that "the reality of the evolving concept of what comprises a family cannot be overlooked." 193 A.3d at 900.

While that is certainly true, *C.G.* actually negates Legg's claim here. The *C.G.* Court found that a former same-sex, unmarried partner of a biological parent did not have standing as a parent under Section 5324(1). The Court held that under our precedent, - which is the same precedent cited to by Legg

here - parentage for purposes of standing may be proven only by biology, adoption, a presumption attendant to marriage, or legal parentage by contract in circumstances "where a child is born with the assistance of a donor who relinquishes parental rights and/or a non-biologically related person assumes legal parentage." *Id.* at 904. There is no dispute that Legg is not a biological or adoptive parent to S.K., was not married to Connie at the time of S.K.'s birth so as to implicate the presumption attendant to marriage, and was not a party to a contract regarding the custody of S.K. Therefore, even had Legg properly raised this issue, we would find it lacks merit as Legg is clearly not a parent pursuant to Section 5324(1) under *C.G.*

*C.G.* also guides our resolution of Legg's next claim, which, unlike his first, is properly raised. In this claim, Legg argues the lower court erred by finding that he did not have standing as i*n loco parentis*. As *C.G.* outlined:

> The phrase "*in loco parentis*" refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of i*n loco parentis* embodies two ideas; first, the assumption of parental status, and second, the discharge of parental duties. The rights and liabilities arising out of *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, can not place himself *in loco parentis* in defiance of the parents' wishes[.]

*Id.* at 907 (citation omitted). The *C.G.* Court went on to note that "[*i]n loco parentis* analyses are necessarily fact-intensive and case-specific inquiries[.]" *Id*. at 911. As such, the Court also held that trial courts should be allowed to consider all relevant evidence, including the post-separation conduct of a

person seeking custody of a child, when determining whether that person stands *in loco parentis* to that child. ***See id***. at 910-911.

Here, the trial court explained its reasons for rejecting Legg's claim that he stood *in loco parentis* to S.K. while she lived with him as follows:

> [Legg] testified that while he was married to the natural mother, S.K. and her brother J.K. were residing with them and from July 2016 to August 2018, he raised S.K. as his own and performed the parental duties that a father would to his own daughter…. [However,] only [Legg] and [Legg's] mother testified to support the position that he stood *in loco parentis* to the child. The Court finds it telling that [Legg] did not request the court to conduct an *in camera* interview of the two children, S.K. and her brother, J.K., nor did he call [Connie] in his case in chief … in order to support his position that he stands *in loco parentis* to S.K. [or that any alleged relationship with S.K. was with Connie's consent]. The court questions why [Legg] omitted what could have been significant testimony to support [Legg's] status of *in loco parentis*. This Court finds that [Legg] did not present sufficient evidence to prove that he stood *in loco parentis* to the child during the time that S.K. resided with him and the natural mother."

Trial Court Opinion, 2/8/21, at 5-6. CYS emphasizes that aside from his and his mother's testimony, Legg did not provide any evidence that he discharged parental duties for S.K. while he lived with S.K. and prior to the time CYS assumed custody of her. Although Legg mentions that he submitted photographs of himself and S.K. at the hearings, the photographs were "from the time when [S.K.] was in the custody of [CYS] and [CYS] was allowing visitation between [S.K.] and her biological sibling." CYS Brief at 8; ***see also*** N.T., 9/17/20, at 34 (Legg admitting that the photographs did not show any of the alleged duties he performed while S.K. was living with him and before CYS assumed custody of S.K.).

- 10 -

The trial court then went on to consider Legg's post-separation conduct, specifically noting that **C.G.** allowed it to do so. To that end, the trial court found that although Legg claimed that he sought and was denied custody of S.K. in Lackawanna County, he provided no documentation to substantiate those assertions. Even if Legg filed for custody of S.K. in Lackawanna County, as he maintained, the trial court observed that there was no way for it to know the basis on which the Lackawanna County trial court had denied custody. Moreover, the trial court noted that Legg had an opportunity to file for custody of S.K. when he filed the Protection from Abuse petition against Connie, but did not. Therefore, Legg "to this day, does not have a custody Order preserving his custody rights of S.K." Trial Court Opinion, 2/8/21, at 7.

The trial court also specifically found Kesko's testimony that Legg had refused the opportunity to be a placement resource for S.K. to be more credible than Legg's testimony to the contrary. Therefore, the trial court found that CYS only pursued S.K.'s placement with her current foster mother after Legg asserted that he could not care for S.K. CYS adds that it obtained custody of S.K. on April 15, 2018 and "since at least that time," Legg has not assumed parental status nor discharged any parental duties for S.K. CYS Brief at 7.

The trial court also considered, and rejected, Legg's claim that he had a strong psychological bond with S.K. and this bond should have been the determinative factor in finding that he had gained *in loco parentis* status. It is this analysis that Legg focuses on in his appeal, summarily arguing that "it

should have been the paramount concern to the [trial court] whether [S.K.] had developed strong psychological bonds to [Legg] and her half-sister" and "the trial court failed to focus on the existence" of these bonds. Appellant's Brief at 20, 21. Legg, however, fails to substantiate these claims.

"Of course, it is a concern to the courts whether a child has developed strong psychological bonds [with the person seeking *in loco parentis* status], however, such bonds must necessarily be based on the assumption of parental status and discharge of parental duties in order to achieve [*in loco parentis*] status." **C.G.**, 193 A.3d at 910. The existence of a child's psychological bond with the person seeking standing is therefore not the determining factor when resolving whether that person stands *in loco parentis*. **See id.**

Here, the lower court found that Legg did not have a strong psychological bond with S.K. To that end, the court noted that Donovan testified that she reached out to Legg to set up visits between S.K. and K.L., but that Legg also attended the visits. When those visits negatively affected S.K., in that S.K. became anxious about the visits, CYS sought and obtained a court order to end Legg's attendance at the visits.

The trial court also found that the testimony of Suzanne Kapral, the court-appointed special advocate for S.K., supported its conclusion that Legg did not have a strong psychological bond with S.K. Kapral testified that S.K. is doing "extremely well" in her foster home and refers to her foster mother as "mom." N.T., 7/23/20 at 35-36. She testified that as the sibling visits with

Legg in attendance went on, she noticed a negative change in S.K.'s behavior and clear signs of tension before the visits. *See id.* at 37, 40.

Legg has not offered any meaningful argument, much less demonstrated, that the trial court erred in finding that S.K. did not have a strong psychological bond with Legg based on this testimony.

We also briefly address Legg's assertion that S.K's bond with her half-sister, K.L., should have dictated that Legg, as K.L.'s custodial parent, stood *in loco parentis* to S.K. Our courts have been clear that the inquiry for whether a person stands i*n loco parentis* to a particular child centers on whether that person has assumed parental status as to that child and discharged parental duties to that child. Not granting *in loco parentis* status to Legg in no way means that S.K. should not be allowed to continue her relationship with her half-sister. Indeed, S.K.'s foster mother testified that she was the one who initiated the visits between S.K. and K.L. and it was her intention to allow that contact to continue after she adopted S.K. *See id.* at 46-47.

In the end, we discern no error in the court's "fact-intensive and case-specific" analysis or its conclusion that Legg did not have *in loco parentis* standing, especially since that conclusion was partially based on the court's credibility determinations. *See C.G.*, 193 A.3d at 911 (affirming trial court's order on the basis that the Court could discern no legal error in trial court's analysis, which included credibility determinations, regarding whether the appellant stood *in loco parentis*). We therefore affirm.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/28/2022</u>