J-A17003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CATHERINE H. JONES | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN F. JORDAN | : | |
| | : | |
| Appellant | : | No. 131 WDA 2025 |

Appeal from the Order Dated January 2, 2025
In the Court of Common Pleas of Cambria County Civil Division at No(s):
No. 2024-1372

BEFORE:  McLAUGHLIN, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED:  September 4, 2025**

John F. Jordan ("Father") appeals from the order granting Catherine Jones ("Mother") primary custody of their children D.J. and J.J. (collectively, "Children") and granting Mother's petition to relocate. He argues the court abused its discretion in applying the custody factors, failed to consider his relationship with Children when awarding primary custody to Mother, failed to require Mother to meet her burden in establishing relocation would be in Children's best interest, and erred in finding a decrease in his custody time would best serve Children's needs and welfare. We affirm.

Mother and Father were married in 2016 and divorced in August 2023. Mother filed a complaint for custody of Children in March 2024 and a notice and affidavit of relocation in April 2024. The court held a two-day custody hearing. At that time, D.J. was six years old, and J.J. was four years old.

Mother testified that she lived with her parents ("Maternal Grandparents") and Children in Johnstown. N.T., Sept. 26, 2024, at 5. She stated D.J. attended first grade at Richmond Elementary School and J.J. attended pre-kindergarten at Little Peaches. *Id.* at 6. Mother testified she worked at UPMC Bedford as a senior human resources coordinator. *Id.* at 7.

Mother testified that she and Father had an agreement for shared custody of Children, with a mid-week transfer. *Id.* at 7-8. She asked the court for primary custody of Children, particularly primary custody on school nights. She also sought to relocate to Bedford, which is in the Bedford School District. *Id.* at 9-10.

Mother testified that during their marriage, there "was a whole lot of mental and emotional abuse that she suffered from [Father], as well as financial infidelity [and] suspected sexual infidelity from [Father]." *Id.* at 11. She stated that Father would "frequently . . . tear [her] down either to [her]self or to other people." *Id.* at 12. He would "make comments about [her] appearance, telling [her] that [she] was fat and disgusting, telling [her she] was wearing too much makeup, not enough makeup." *Id.* She further stated he would tell her she was "incompetent at cooking, cleaning, baking," and that she was a bad mother and a slut. *Id.* She testified Husband would call her a "bitch" in front of Children and others and "have verbal outbursts, screaming over minor things." *Id.* at 12-13. She stated that an example was that she would ask Husband to change J.J.'s diaper, and Husband would say, "I have to change your diaper because your mom is a piece of shit." *Id.* at 13.

- 2 -

Mother testified she tried to have conversations with Father about his behaviors and "begged him to treat [her] like a human and give [her] basic respect." *Id.* Mother stated that she told Husband she wanted a divorce in 2019, but they reconciled a few times. She said she finally left Husband in October 2022 after D.J. called her a "bitch" because she "recognized that [C]hildren were going to grow up and treat [her] the exact same way" as Father did. *Id.* at 14.

Mother testified that when she was pregnant with D.J., Father threw a full beer can and hit her stomach. *Id.* at 19-20. Mother further stated that Father threw their cat down the stairs, stomped on her sister's foot, and threw a wrench at a fence. *Id.* at 20-21.

Mother testified that she was the primary caretaker of Children while she and Father were together. *Id.* at 24. Mother testified that she made and attended Children's doctor appointments and scheduled and attended their activities. *Id.* at 24, 32-34. Father did not. *Id.* at 34, 36. She further testified she was involved in Children's education, and Father was not. *Id.* at 37-40.

She testified that in the first six months of their separation, Father had Children stay with Mother's parents overnight on at least 16 or 17 occasions. *Id.* at 26. Mother stated that when Father started dating his significant other, Children would spend overnights at Father's house. *Id.* at 27.

Mother testified that she believe the current mid-week transfer "puts undue stress" on Children and is causing "a lot of emotional stress" and impacting them academically. *Id.* at 41. She stated that D.J. told her that he

lost points on reading homework because he only wrote one sentence, not three, and did not turn in his "little reader" book. *Id.* at 42. She testified D.J. was "panicked" because he did not know where the book was, but it was at Father's house. *Id.* Mother noted that Children deal with different expectations and routines in the two households. *Id.* at 43. Mother testified that she tried to talk to Father about providing more consistency for Children, but Father tried to get Children involved in the conversation. Father then "screamed" at her and "threw a chair," and she had to threaten to call the police. *Id.* at 44.

Mother testified that she has been dating I.M. ("Boyfriend") since March 2023. *Id.* at 51-52. Boyfriend lives in Bedford and she would be relocating to his home. *Id.* at 52. Boyfriend is a Corrections Officer at Cumberland, and has two children, a 15 year old and a 14 year old. *Id.* at 52-53. He has shared custody of one child and full custody of the other, and Children "get along really well" with Boyfriend's children and have a bond with Boyfriend. *Id.* at 53-54.

Mother testified that, regardless of who has custody, D.J. is dropped at the home of Mother's sister ("Maternal Aunt") before school and goes to Maternal Aunt's house after school. *Id.* at 57-58. J.J. stays with Maternal Grandparents on Mondays and Wednesdays and goes to Little Peaches on Tuesday, Thursday, and Friday. *Id.* at 58. Mother works in Bedford, so she drives 45 minutes to pick up D.J. from Maternal Aunt and J.J. from Little Peaches, if he is there. *Id.* at 59. Mother stated she has to rush to make sure D.J. gets to practices on time, eats dinner, and does his homework. *Id.* at 60.

Mother testified that living in Bedford would allow her to put Children on the school bus, because it comes at 7:30 a.m. *Id.* at 61. She testified that the bus drops Children off at 4:00 p.m., and she would talk to her boss about being able to leave so she could meet the bus and have the rest of the evening with Children. *Id.* at 63. She stated Bedford schools have a pre-kindergarten class, so Children would be at the same school. *Id.* at 62. She would live about a mile from the school and four miles from work. *Id.* at 62. She stated she would be able to get to Children quickly if one of them got sick. *Id.* at 63.

Mother testified about her research into the two school districts. She stated that she did not think one was preferable to the other, and that she believed most schools in the area were similar and would provide a good education. *Id.* at 67-69.

Mother testified that she lost her job in September 2023. *Id.* at 27, 71. She started applying to every position she could, and "applied to probably 100 different jobs." *Id.* at 71. She stated she had interviews with about five different companies and the UPMC in Bedford was the only company that offered her a job. *Id.* at 72.

Mother testified that the concerns she had when Children are in Father's custody are about Father's "bullying behavior," both toward Children and encouraging Children to have bullying behavior toward others, including calling their cousin a "loser." *Id.* at 75-76. She testified that J.J. told a daycare teacher that Father was going to come to school and shoot her, and Father blew off the situation, saying, "[W]e don't talk like that." *Id.* at 77.

Mother testified that Father had a girlfriend (S.) prior to his current significant other, B.K. ("Girlfriend"). She said that when Father introduced Children to B.K. they asked about S., and Father said, "[W]e're hanging out with [B.K.] now, so what do we need [S.] for." *Id.* at 81. Mother testified that Father told her B.K. did not reside with him, but "from [her] understanding" she believed that they lived together. *Id.* at 85. Mother testified that she offered to introduce Boyfriend to Father, but Father is not interested in meeting him. *Id.* at 87-88.

Mother testified that D.J. told her that he tried to tell Father about a vacation Children took with Mother and Father said he "didn't want to hear about it." *Id.* at 89. She stated that she takes an "active interest in everything," including wanting to hear about trips to the beach and other things Children do with Father. *Id.* at 90.

Mother testified she had concerns when Children were with Father, stating Children do not have a consistent bedtime routine with Father and that Children tell her they do not brush their teeth with Father. *Id.* at 92-93. Mother also has concerns about alienation, noting Father had made comments to Children about how Father could not live with them because of Mother. *Id.* at 94. She said D.J. told her that he feels like he "doesn't have a home." *Id.* at 95.

On cross-examination, Mother testified that she and Father separated in October 2022, she told him she wanted a divorce in December 2022, and she told him many times to find a new place to live. *Id.* at 100. Father moved out

in April 2023, after coming home to find Boyfriend in the driveway. *Id.* at 101. Mother testified that Father stormed in the house, and did not speak to her or Boyfriend. After Boyfriend left, Father told Mother that "he had a thought to run [her] and [Boyfriend] over with his truck," and that he had taken Boyfriend's license plate and was considering "finding out where [Boyfriend] lived and visiting him." *Id.* at 102.

Father testified that he did not feel it was in Children's best interest to relocate to Bedford. *Id.* at 125. He lives in Johnstown, which is in the Richland School District. *Id.* at 134. He stated that he lived there with Children and, "on a part time basis," with Girlfriend and Girlfriend's daughter. *Id.* at 135. Father testified that S. was never his girlfriend. *Id.* at 137. He stated Children have a good relationship with Girlfriend and Girlfriend's daughter. *Id.* at 136-38.

Father testified that Mother told him that she wanted to move to Bedford to be with Boyfriend. *Id.* at 140. He further testified that when Mother offered to introduce him to Boyfriend, it was two weeks after he saw him in the driveway and he was not mentally in a position where he wanted to meet him. *Id.* at 141. He testified that Boyfriend was at J.J.'s birthday party and did not approach Father to speak with him. *Id.* at 185.

Father testified that he is a paramedic, partners with multiple different EMS agencies, and is the EMS Chief of Somerset Ambulance. *Id.* at 142. He usually works 10 to 12 hour days on Mondays and Tuesdays, and has more flexibility later in the week, but stated there is "off-hour stuff," which is usually

administrative. *Id.* He also oversees and coordinates having EMT or paramedics at hockey and football league events. *Id.* at 142-43. He stated he tries to avoid working games on his custody nights. *Id.*

Father stated that he did not tell D.J. that he did not need to apologize to his cousin for calling her a loser. *Id.* at 147. He stated that he would continue to allow Children to have contact with Maternal Grandparents and Maternal Aunt. *Id.* at 149.

Father testified that in hindsight, the parties were in a "very toxic relationship on both sides," stating there was "mental abuse, verbal abuse that went both ways." *Id.* at 149-50. He stated he was working on being better, going to counseling and therapy. *Id.* at 150. He stated he currently is taking medication and it is managing his mental health "extremely well." *Id.* at 153. He testified that he believes D.J. should participate in therapy but has not discussed this with Mother. *Id.* at 153-54.

Father testified that at a football game, J.J. wanted to go say hi to Father, but Mother "direct[ed J.J.] away from [Father]." *Id.* at 158. He further testified that at D.J.'s kindergarten graduation, Mother and J.J. walked by him and J.J. said, "Daddy," and Mother pulled him and yelled, "I'm not dealing with this," and took J.J. down front. *Id.* at 173. After the ceremony, according to Father, Mother was "standoff-ish," tried to turn D.J. away from pictures, and said to Father's friend H.V., "[Y]ou mean nothing to them." *Id.* at 174.

Father testified that Richland Elementary School was named a National Blue Ribbon School, and it was one of only 13 schools in Pennsylvania to

achieve that. *Id.* at 166. He testified that based on the data the school districts seem comparable but that based on his experience with Richland, he feels it is superior. *Id.* at 167.

Father testified that at his home, Children go to bed at 8:00 p.m., with "lights out" at 8:30. *Id.* at 170. He further testified that they brush their teeth in the shower, which is their "new thing." *Id.* He testified that he has gotten away from yelling at Children. He instead has started verbally redirecting them and sometimes doing time outs. *Id.* at 170-71.

Father testified he was objecting to relocation because of the custody request, stating that he feels Children would be "better off staying in a familiar area with familiar people." *Id.* at 171. He testified he believed relocation would impact his relationship with Children because he would not see them as much. He said he would not "get to participate in . . . their daily life helping them with homework, just experiencing life with them." *Id.* He stated he was not opposed to Mother relocating. *Id.* at 177.

Father testified he had a good relationship with Children, noting they wear cutoff t-shirts and backward hats like him. *Id.* at 175. He loves that Children try to be like him. *Id.* On cross-examination, Father stated that when he became aware of how Children mimicked him, he tried to make changes and be more aware of his "body language, posture, tone, thinking before [he] speaks so that the message that comes out is productive versus counterproductive." *Id.* at 181.

Father testified that from his work to Bedford was about 45 minutes. *Id.* at 183.

Mother testified that she did not have time to stop at the graduation because they were running late and had to find seats and that she let them take pictures. She said she was in a hurry after the ceremony because she promised D.J. ice cream. She admitted she said Father's friend was "no one" to Children, and stated that she was frustrated because Father's friend could be there but there were not enough tickets for Maternal Aunt. *Id.* at 207-08. She stated she should have handled it better. *Id.* at 208.

Mother's father, T.J. ("Maternal Grandfather"), testified that he had been a teacher at the Richland School District, and had nothing negative to say about the school district. N.T., Sept. 27, 2024, at 11, 21. He stated Bedford School District was also a very good school district with a great reputation. *Id.* at 21. He did not "view this as a battle between school districts," but saw the question as "what parent is going to support [Children's] educational progress, focus and work with them every evening." *Id.* at 22. He testified that Mother focuses on Children's education, and Father does not. *Id.* He agreed that Richland Elementary School was named a Blue Ribbon School, but did not view it as "pertinent to what they're talking about." *Id.* at 26. Grandfather testified that he would continue to see Children if they moved to Bedford. *Id.* at 27.

Mother's sister S.M. ("Maternal Aunt") testified that D.J. gets on and off the bus at her house every day and she sees J.J. a couple times a week. *Id.*

at 45-46. She testified that in 2015 when the family was in Universal Studios, Father stepped on the back of Mother's shoe, and Mother turned around and looked at him. *Id.* at 50. Father then stomped on Maternal Aunt's foot and broke her toe. *Id.* He also made fun of Maternal Aunt. *Id.* at 51. Maternal Aunt testified that she sees a "big difference" in D.J. on the days he is with Mother versus the days he is with Father, noting that D.J. is more aggressive on days he is with Father. *Id.* at 52-53. She further testified that at one point D.J. called her daughters losers, and Father had D.J. apologize to one daughter, but said he did not have to apologize to the other because she was "kind of a loser." *Id.* at 55. She stated Father would trip her daughters and would say mean things to them. *Id.* at 56-59. Maternal Aunt testified she "[a]bsolutely" would be able to maintain a relationship with Mother and Children if they moved to Bedford. *Id.* at 67.[1]

Boyfriend testified that he is a Corrections Officer at the Federal Correctional Institution in Cumberland, Maryland. *Id.* at 91. He has two children, and has primary custody of one child and his ex-wife had primary custody of the second child. *Id.* at 92. Boyfriend feels he has a bond with Children, and stated Children get along with his sons. *Id.* at 94. Boyfriend testified he tried not to swear in front of Children and when they first started dating, he had a discussion with Mother about her language, and he thinks she "took it to heart and changed those ways for the better." *Id.* at 97. He

---

[1] Mother's friend M.H. and Father's neighbor J.F. also testified.

noted that her swearing had been pretty regular in front of Children. *Id.* at 97-98. He stated he and Mother have every intention of getting married. *Id.* at 110.

Father's friend H.V. testified that she and Mother had been friends, but no longer were. *Id.* at 114. She continued to be friends with Father. *Id.* at 115. She stated she got tickets to D.J.'s graduation from a neighbor, who also had a child graduating. *Id.* at 116. She stated that J.J. saw Father at the graduation, and Mother pulled him down the aisle and said, "I'm not dealing with this today." *Id.* Further, after the graduation, Father was trying to take pictures, and Mother informed H.V. that she "was nothing to the boys." *Id.* She testified she saw Father trip his niece at a party. *Id.* at 120-21. She stated that she "pretty regularly" heard Mother swear in front of Children. *Id.* at 124. She testified she sees Father every day and Children at least once a week. *Id.* at 124. She stated that Father is Children's "whole world," she has seen Children tell Father they love him, Children want to cuddle with him, and she has seen Children and Father playing cards and hot wheels together. *Id.* at 124-25. H.V. stated that before, Father was easily agitated but now is putting in more effort and has control of his temper. *Id.* at 125.

Following the hearing, the court allowed Mother to relocate to Bedford, Pennsylvania for the 2025-2026 school year, awarded shared legal custody with Mother having primary physical custody during the school year. The court granted Father custody on the first, second, and fourth weekends of each

month, with the parties would sharing physical custody during the summer, on an alternating-week schedule. Father appealed.

Father raises the following issues:

> I Did the trial court commit an abuse of discretion in its application of 23 Pa.C.S. § 5328?
>
> II. Did the trial court abuse its discretion in failing to consider the Father-Child relationships in awarding primary physical custody to Mother?
>
> III. Did the trial court abuse its discretion in failing to require Mother to fully meet her burden in determining that the relocation is in [C]hildren's best interest?
>
> IV. Did the trial court err in finding that there was sufficient evidence presented at trial to establish the decrease in Father's custody time would best serve the needs and welfare of [C]hildren?

Father's Br. at 4 (trial court answers omitted).

## I.   Custody

Father's first, second, and fourth issues challenge the court's custody award. When reviewing a custody order:

> We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence. We defer to the trial [court] regarding credibility and the weight of the evidence. The trial [court]'s deductions or inferences from its factual findings, however, do not bind this Court. We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.

***D.Q. v. K.K.***, 241 A.3d 1112, 1117 (Pa.Super. 2020) (citation omitted) (alterations in original).

The Child Custody Act requires a trial court to consider all of the Section 5328(a) factors when "ordering any form of custody." 23 Pa.C.S.A. § 5328(a). In child custody cases, the "paramount concern" is the child's best interests. **R.L. v. M.A.**, 209 A.3d 391, 395 (Pa.Super. 2019) (quoting **C.G. v. J.H.**, 193 A.3d 891, 909 (Pa. 2018)). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." **Id.** (quoting **M.J.N. v. J.K.**, 169 A.3d 108, 112 (Pa.Super. 2017)). The Act directs courts making custody orders to determine the child's best interests by considering "all relevant factors," including certain enumerated factors:

> **(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to ensure the safety of the child.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
> >
> > (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> >
> > (2.2) Violent or assaultive behavior committed by a party.
> >
> > (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and

- 14 -

another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Here, the trial court found that Mother was more likely to ensure the safety of Children. Regarding present or past abuse, the court noted Mother testified that Father was emotionally abusive to her throughout the marriage, including "'tearing her down,' financial infidelity, and sexual infidelity," and found the factor favored Mother. Trial Court Opinion, filed 1/2/25, at 20, 18. The court further noted the following examples of abuse – Father threw a full beer can at Mother's pregnant stomach; Father threw a cat down the stairs; Father stepped on Maternal Aunt's shoe; Father threw a wrench at the fence in front of Children and other people; Father told Mother that he "had a thought to run [Mother] and [Boyfriend] over with a truck"; Father had taken a picture of Boyfriend's license plate and considered "going to visit him"; and Father told J.J. that he was going to hurt one of his teachers. *Id.* at 18 (citations omitted).

For the factor considering violent or assaultive behavior, the court noted the examples cited under the abuse factor. It also noted that Father testified that, "In hindsight, it was a toxic relationship. There was mental abuse on both sides. I've never hidden the fact that I was not a good husband." *Id.* at 20. The court found this factor favored Mother.

The court found that the factor considering which party was more likely to encourage and permit frequent and continuing contact between Children and the other party favored Mother. It acknowledged that Mother would not allow J.J. to say hello to Father at a football game and reacted poorly at D.J.'s kindergarten gradation. *Id.* at 21. It found Mother "offered weak excuses" for her behavior at the gradation, and the excuses lacked credibility. *Id.* It pointed out, however, that Mother acknowledged she could have, and should have, handled the situation better. *Id.* The court further found that Father had a "history of denigrating Mother to and in front of [C]hildren," which was a serious concern "and one of the most significant factors of this custody case." *Id.* It found Father's actions, "if not curtailed, have a high probability of poisoning [C]hildren against Mother" and is "tantamount to discouraging [C]hildren from having contact with Mother." *Id.*

The court found the factors regarding parental duties performed by each party favored Mother. The court found the factor considering the need for stability and continuity in the child's education, family life, and community life, favored Mother. It noted that the "current logistics and extended family involvement ensure that [C]hildren are lovingly cared for, but the schedule affords little in the way of stability." *Id.* It pointed out Maternal Aunt was responsible for before- and after-school care, and Maternal Grandparents assist. *Id.* It further noted that Mother and Father have divergent parenting philosophies and routines, and that Mother and Children spend many

weekends in Bedford with Boyfriend. The court found Children have not had "a consistent 'home base' under the current schedule." *Id.*

The court found the availability of extended family favored Mother, and that the factor weighing sibling relationships was not relevant. The court found the factor considering the well-reasoned preference of the child favored Mother, stating, "[C]hildren are too young to express a credible preference, except as noted by the parents herein." *Id.* at 22, 16.

The court found the factor considering the attempts of a party to turn the child against the other party favored Mother and was "a significant factor in the custody determination." *Id.* at 22. It referenced its discussion of the factor regarding the party more likely to encourage contact. It further pointed out Father's pattern of denigrating Mother to and in front of Children. It observed he had called her a "bad mother" in front of Children, told Children he had to change their diapers because "your mom's a piece of shit," and told Children he could not live with them because he could not live with Mother. The court noted that that Mother left Father after D.J. called her a "bitch." *Id.* at 16.

The court found Mother was more likely to maintain a loving, stable, consistent, and nurturing relationship with Children. *Id.* at 22. It found both parents love Children, but that Mother was more nurturing and attentive, and that she disciplined in a more positive manner, whereas Father disciplined with screaming and timeouts. *Id.* The court found Mother took an active interest in Children, asking them about their time with Father, and noted that Mother

testified that D.J. told Mother that Father stated he did not want to hear about a vacation Children took with Mother. *Id.*

The court found Mother was more likely to attend to Children's daily physical, emotional, developmental, educational, and special needs. *Id.* at 23. It further found the proximity of the residences of the parties favored Mother, as the court was going to permit her to relocate. *Id.* The court found that the factor considering the party's availability to care for Children and make childcare arrangements did not favor either party. *Id.* The court further found the factor considering the level of conflict between the parties favored Mother, reasoning that the level of conflict was severe and that Father was more at fault for the breakdown in the parties' communications. *Id.* The court found the factor considering drug or alcohol abuse was not relevant, and that the factor considering the parties' mental and physical condition favored Mother. *Id.* at 23-25.

On appeal, Father first argues the court abused its discretion in holding that Children's best interest would be served by granting primary custody to Mother. He claims the court was partial and biased and did not properly weigh the evidence. Father argues that for the factor that considers the present and past abuse committed by a party, he testified that Mother committed mental abuse and that he said the parties were in a "toxic relationship." Father's Br. at 16. He states that Mother did not raise Father's abusive behavior in any pretrial pleadings and that he has been in therapy for over two years and was taking medication for anxiety. Father also challenged the court's findings as

to the factor considering the need for stability and continuity in the children's education, family, and community life. He maintains the parties are similarly situated with this factor, but the trial court gave greater weight to Mother. He alleges that he provides stability and continuity in his Johnstown home, and, if Children remained with Father, they would remain in the same school district. He states that Mother's approach is the approach that "requires uprooting the minor children and disabling the stability that already exists in Father's care." *Id.* at 17.

Father next maintains that the court erred in finding Children's preference favored Mother. He maintains there was testimony that Children have indicated preferences for both parents. He points out they were very young and unable to state a credible preference, but that the court stated it would consider the preferences the parties noted in their testimony. He argues that despite "testimony indicating that the minor children adore him, imitate him, and want to spend time with him, the trial court ruled for Mother on this factor." *Id.* at 18. Regarding the parties' attempts to turn Children against the other parent, Father claims the court erred. He argues that he admitted to degrading Mother in front of Children, but that Mother engaged in the same behavior against Father. He noted that Mother prohibited Children from engaging with Father at extracurricular activities, and the court erred in emphasizing his shortcomings.

The record supports the trial court's factual findings regarding the custody factors, and it did not abuse its discretion in finding Children's best

interest would be served by awarding primary custody to Mother. Although Father testified that the marital relationship was toxic and alleged Mother also committed emotional abuse, the court credited Mother's testimony regarding the extensive abuse committed by Father. Further, it was not an abuse of discretion to find Mother would provide more stability, as there was testimony that more consistent routines existed at Mother's home. That Children will attend a different school district does not require a finding that the more stable home is Father's home. Further, the court did not abuse its discretion in finding Mother was more likely to encourage contact. The court considered her behavior in preventing J.J. from saying hello at the graduation, but noted that she acknowledged she should have behaved better, and the court also considered Father's behavior in denigrating Mother to and in front of Children.

We do conclude that the court should not have considered Children's preference here, as Children were too young to express a preference. ***See*** 23 Pa.C.S.A. § 5328(a)(7) ("The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment."). However, if the court had found this factor neutral, it would not have altered the outcome. Father's challenge to the application of the custody factors lacks merit.

Father next maintains that the court abused its discretion in failing to consider the father-child relationships when awarding custody. He maintains the court focused on the Mother's bond with Children and how it positively affected Children, even though she had shortcomings, but failed to afford Father the same consideration, as it rarely focused on his positive relationship

with Children. Father notes that Children imitate him and that Father had done a lot of self-work to be more positive after realizing Children may imitate his negative behaviors. Father also emphasizes H.V.'s testimony that Children tell Father that they love him and regularly cuddle with him. He further points out that he testified that Children have a close relationship with Girlfriend, and claims that he encourages a healthy, blended-family dynamic.

We conclude the court did not abuse its discretion in awarding primary custody to Mother. It considered Children's bond with both parties, as well as how the parties' behavior impacted Children.

In his fourth issue, Father argues the court erred in finding that a decrease in Father's custody time would best serve Children's needs and welfare. He maintains Children love and adore him, and maintains the evidence establishes that Children would face difficulty if required to relocate, "through a combination of adjusting to the school district and a change in the custody scheme." *Id.* at 30. He maintains a decrease in his custody time is not in Children's best interest. He argues that he provides stability and familiarity.

As discussed above, the court considered all custody factors and did not abuse its discretion in awarding primary custody to Mother during the school year.

## II.    Relocation

Father also argues the court abused its discretion in finding Mother met her burden in establishing that relocation was in Children's best interest.

Father argues that Mother's boyfriend resides in Bedford and claims a "large portion of Mother's justification for moving to Bedford comes from her desire to pursue her relationship." *Id.* at 26. He notes that he testified that Mother told her that her motivation for the move was to live with Boyfriend. *Id.* Father argues that he "has nothing against Mother's desire to relocate to live with [Boyfriend], so long as this d[oes] not disrupt the stability the minor children enjoy living in Johnstown." *Id.* Father notes that Maternal Grandfather, who was a teacher, testified that he did not view the choice between districts as a major issue, and that he agreed that Richland Elementary School was recently named a Blue Ribbon School. He further claims that Mother and Maternal Grandfather "refused to acknowledge that continuing to attend Richland School District is substantially more beneficial than forcing the minor children to attend Bedford School District." *Id.* at 28.

Upon any objection to the relocation, the court must hold a hearing and consider whether relocation is warranted under the relocation factors of Section 5337(h). 23 Pa.C.S.A § 5337(g), (h). Those factors are:

> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>
> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody

- 23 -

arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

Regarding the sixth factor – the effect of relocation on the quality of life of the party seeking relocation – the court explained that Mother worked in Bedford, and therefore a relocation would reduce her travel time and allow her to spend more time with Children. It further noted that she would no longer have a 30-mile distance from Boyfriend, and she would benefit from having Boyfriend available to assist with logistics regarding Children. In discussing the effect of relocation on Children's quality of life, the court noted that Children will benefit because of "simpler logistics and more time with Mother." Trial Ct. Op. at 17. It noted that currently Maternal Aunt and Maternal

Grandparents help with child care, as D.J. is at Maternal Aunt's house before and after school and J.J. is with Maternal Grandparents twice a week. It pointed out that Mother drove 45 minutes from her work to pick Children up and get them to activities. The court reasoned that if Mother relocated to Bedford, she would reside one mile from the school and four miles from work, and she would be able to get Children on the bus in the mornings and planned to ask for flexibility at work to get Children off the bus after school. Further, the court found Mother's reasons and motivation for seeking relocation "sincere and well-developed." *Id.* at 17. It further found that Father's "'reason "for contesting [C]hildren's relocation [was] believing 'his time would be cut,'" and that Father did not believe that uprooting Children would be good for them. *Id.* at 17-18. The court found Father's "motives as they relate to [C]hildren are genuine," but that his concern about losing time with Children was "misdirected." *Id.* at 18. It explained that it had adjusted the custody schedule because of Father's actions and behaviors, not because of the proposed relocation. *Id.*

The record supports the court's factual findings and it did not abuse its discretion when it permitted Mother to relocate. As discussed by the trial court, Mother relocated to be closer to her work, which would reduce her commute and allow her to spend more time with Children, as well as be closer to her Boyfriend.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  9/4/2025